[No. D011990. Fourth Dist., Div. One. Mar. 17, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID CASTRO PEREZ, Defendant and Appellant.

## COUNSEL

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Robert M. Foster and Nancy L. Palmieri, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WIENER, Acting P. J.**—A jury found defendant David Castro Perez, a prisoner, guilty of assault with a deadly weapon (Pen. Code, § 4501)[1] and possessing a deadly weapon (§ 4502). The jury also found Perez personally used a deadly weapon under section 1192.7, subdivision (c)(23) as to both counts. Perez appeals, contending the evidence was insufficient to support the judgment and the court erred in denying his motions for self-representation and for new trial based upon jury misconduct. For the reasons set forth below, we remand for the court to conduct a limited inquiry on issues relating to Perez's new trial motion. We affirm the judgment in all other respects.

I.

### SUFFICIENCY OF THE EVIDENCE

#### A.

Perez and the victim, Anel Rojas, were inmates at the Donovan State Prison in San Diego. On the date of the stabbing, Rojas and Perez were standing outside in the exercise yard. Officer Frank Ardilla stood in a control booth overlooking the yard. Ardilla saw Rojas and Perez engage in a "verbal argument," which "seemed very heated." As Perez and Rojas walked towards the housing unit, Ardilla saw Perez charge at Rojas with his arm uplifted. Rojas attempted to defend himself but was too late, and Perez struck Rojas in the right side of the neck with an object. Ardilla then saw Rojas clench his neck with his left hand and observed blood flowing between Rojas's fingers. Ardilla went to the window and ordered everyone in front of the building to freeze and to get down. Except for Perez everyone complied. Perez kept on walking. When Perez did not stop, Ardilla went to

---

[1] All statutory references are to the Penal Code unless otherwise specified.

the gun rack and removed a rifle, aiming it at Perez. Perez turned and hit the ground. Ardilla then directed correction officers to search the ground following Perez's path up to the point where he was stopped. Using a metal detector, one officer found a weapon in a puddle along the path Perez had taken. The weapon was an inmate-manufactured weapon sharpened to a point and made from metal stock.

During a search conducted two hours after the attack, Officer Grace Johnson found another weapon in a trash can *inside* the prison. The weapon appeared to be an inmate-manufactured weapon that looked like a screwdriver, sharpened to a point.[2] The prosecution's evidence showed the second weapon could not have been used in the attack because all prisoners were searched before they went inside the building.[3] Johnson explained prisoners throughout the prison frequently discard their weapons after an attack because they know correction officers will probably conduct a general search.

Immediately after the attack, medical technical assistant Mary Kowinsky treated Rojas. Kowinsky believed Rojas's injury was a puncture wound caused by a sharp instrument to the collarbone.

Perez did not testify. Victim Rojas testified he was "absolutely" positive the prisoner who stabbed him was *not* Perez. In rebuttal, the prosecution elicited expert testimony establishing the existence of a prison code of silence resulting in few inmates, if any, ever naming their attackers for fear of retribution.

### B.

■ Contending the court erred in denying his section 1118.1 motion,[4] Perez says the evidence was insufficient to show he had a weapon available to him which could have caused Rojas's injuries. He relies exclusively on the testimony of his expert witness, forensic pathologist Homez Guard, who testified the homemade knife found near Perez in the yard could not have

---

[2] This second weapon was not produced at trial because it could not be found. The prosecution, however, introduced a picture of the weapon drawn by Officer Johnson.

[3] As the prosecutor said during closing argument "there is no way that that [screwdriver] could have been the weapon because it was inside, and people were searched before they went inside. I'm suggesting to you that that weapon was dumped by somebody that was already in the building."

[4] Section 1118.1 provides "[i]n a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal [of] one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. . . ."

been the weapon used in the stabbing.[5] Guard based his opinion on his finding Rojas's wound was one and one-half inches deep and the opening was three-eighths of an inch in width. Guard opined if the knife found in the yard had been used to make a stab wound one and one-half inches deep, it would have left a much wider wound. Guard also concluded the screwdriver-like weapon found inside the prison was consistent with Rojas's wound because of the depth, width, and shape of the wound opening.

Even though such expert testimony is relevant on the issue of whether Perez assaulted Rojas, such evidence is not conclusive. Perez emphasizes there was no prosecution expert to establish the homemade knife could have caused the injury. Nonetheless, in spite of this omission the jury was entitled to draw an inference based upon their evaluation of the evidence, including the fact that the wound was not a rounded hole but a slice. A jury is not required to accept the testimony of an expert witnesses even if he or she is the sole expert testifying at trial. (See *People* v. *Coogler* (1969) 71 Cal.2d 153, 166 [77 Cal.Rptr. 790, 454 P.2d 686].) Here, for example, the jury could have decided to disregard Dr. Guard's testimony because he failed to examine the victim's scar until 11 months after the injury, legitimately finding his ability to determine the type of instrument used to cause an injury could not be resolved by examining scar tissue several months later.

The eyewitness testimony of correction officer Ardilla established Perez struck Rojas in the neck with an object, causing Rojas serious injury. A weapon was found on the path on which Perez retreated after the attack. The jury was shown such weapon and heard testimony describing Rojas's injuries. There was, therefore, sufficient evidence to establish Perez was the individual who caused Rojas's injuries, including that he had the means to do so.

## II.

### FARETTA MOTION

The court initially appointed attorney Evelyn Goldman to represent Perez. At one point early in the representation, Perez became angry at Goldman and

---

[5]Perez also points to inconsistencies in Officer Ardilla's testimony and the victim's denial that Perez was the one who attacked him. Perez recognizes, however, "the jury might have been sufficiently persuaded by the testimony of Frank Ardilla—and equally unpersuaded by the testimony of the victim—to convict [him] based on the prison guard's eyewitness account alone."

spit at her.[6] Based upon this incident, the court relieved Goldman and appointed another attorney. ██ Later, Perez successfully moved on two different occasions to substitute his appointed attorneys. (See *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].)[7] One day before his trial was scheduled, Perez made another *Marsden* motion to substitute his fourth attorney, Donald Levine. The court denied the motion.

On the day of trial, defense counsel unsuccessfully moved for a continuance to permit him to obtain additional witnesses and to petition for a writ from the denial of an earlier section 995 motion. After the court denied the continuance and minutes before jury selection was scheduled to begin, the following exchange took place between defense counsel, Perez and the Court:

"The Court: The record should indicate that I have returned to the bench without the jury panel being called in response to a message that I received before the panel could get through the door. What was that message, Mr. Levine?

"Mr. Levine: Message was Mr. Perez indicated to me he wanted to make a motion to go pro per.

"The Court: It is my understanding that there was a *Marsden* hearing in this matter within the last few days, was there not?

"Mr. Levine: We didn't address the issue of pro per.

"The Court: I understand you did not. When was that *Marsden* hearing?

"Mr. Levine: I think it was yesterday in front of Judge Revak.

"The Court: That's what I thought. [¶] Is Mr. Perez prepared to go to trial this afternoon pro per?

---

[6]Perez was apparently angry at Goldman because she had not obtained a continuance at the preliminary hearing and had purportedly failed to meet with Perez other than at the readiness and preliminary hearings.

[7]In those motions, Perez also moved to represent himself pursuant to *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]. On each occasion, the court substituted counsel and denied the self-representation request, apparently construing the latter request as an alternative motion. In his reply brief, Perez attempts to ground his allegation of *Faretta* error on these early denials of self-representation. This contention is not well taken. By initially accepting each substitute counsel and making no attempt to raise the issue by way of writ or through other channels, Perez waived his right to complain about the early denials of his right to represent himself. The early requests, however, may be relevant in determining whether Perez's *Faretta* motion on the day of trial was timely, including whether Perez asserted the motion for the purpose of delay.

"Mr. Levine: May I ask him?

"The Court: Yes.

"Mr. Levine: Defendant—He indicates he's not.

"The Court: In that case, the motion is untimely. I will not entertain it. [¶] The Bailiff is directed to bring in the jury panel.

"Mr. Levine: Judge, Mr. Perez would like to address you.

"The Defendant: Can I address the court, your honor?

"The Court: No, I think not. You—

"The Defendant: If I stipulate for the record—

"The Court: These games have gone on long enough. You didn't make this motion yesterday when you found out that Mr. Levine was not going to be relieved. The necessity would be—and, you know, we have had motions for continuances on every ground, every which way, and that's what this is. I'm not going to continue the case. I'm not going to allow a substitution of counsel, and there's therefore no reason for me to listen to you at this point. [¶] We have now come to the moment of truth. There is a jury panel in the hallway, and we are in session. . . . [¶] Get the jury.

"The Defendant: Your honor—

"Mr. Levine: Judge—

"The Court: Get the jury. [¶] And remember Mr. Perez, that this is your jury. As soon as they start coming through this doorway—

"Mr. Levine: He wants to proceed by himself, your honor. He's says he's ready to do that.

"The Defendant: I want to speak to the Judge.

"The Court: No, he's not ready to do that. The motion is denied."

██ Perez contends the court erred in ruling his self-representation motion was untimely and in failing to inquire into his reasons for requesting propria persona status.

██ "A criminal defendant has a right under the Sixth and Fourteenth Amendments to represent himself at trial. (*Faretta* v. *California* (1975) 422

U.S. 806, 807 . . . .) The defendant's right is absolute and unconditional if his motion is timely and if he is deemed competent to waive counsel. (*Ferrel v. Superior Court* (1978) 20 Cal.3d 888, 891 . . . .)" (*People v. Hernandez* (1985) 163 Cal.App.3d 645, 650 [209 Cal.Rptr. 809].) A motion is timely if it is asserted " 'within a reasonable time prior to the commencement of trial.' (*People v. Windham* (1977) 19 Cal.3d 121, 128 . . . .)" (*People v. Burton* (1989) 48 Cal.3d 843, 852 [258 Cal.Rptr. 184, 771 P.2d 1270].) "The 'reasonable time' requirement is intended to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice." (*Id.* at p. 852.) To determine whether a motion made at or near the time of trial is timely, the court should inquire "as to the reason(s) for the lateness of the [defendant's] request." *People v. Hernandez, supra,* 163 Cal.App.3d at p. 652.)

A court *must* grant a timely *Faretta* motion. However, where the defendant's motion is untimely, the court is not obligated to grant the motion, but it must exercise its discretion to determine whether the request should be granted or denied. (*People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].) In such situation, *Windham* mandates "the trial court shall inquire *sua sponte* into the specific factors underlying the request thereby ensuring a meaningful record in the event that appellate review is later required. Among [the] factors to be considered by the court . . . are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*People v. Windham, supra,* 19 Cal.3d at p. 128; see *Hernandez, supra,* 163 Cal.App.3d 645, 650.)

█ Here the court found Perez's motion untimely because Perez initially responded he was not ready to proceed with trial. This was a legitimate basis for the court's ruling. ██ A trial court " 'may *deny* a request for self-representation made on the very eve of trial, on the ground that granting the motion would involve a continuance for preparation . . .' " (*People v. Hill* (1983) 148 Cal.App.3d 744, 757 [196 Cal.Rptr. 382], quoting *People v. Fulton* (1979) 92 Cal.App.3d 972, 976 [155 Cal.Rptr. 327].)[8] Perez could have brought his *Faretta* motion a day earlier in conjunction with his

---

[8]We reject Perez's argument that once he changed his mind and stated he was ready to represent himself that day, the court was required to find his motion timely. Such equivocation did not render the motion timely. (See *People v. Hill, supra,* 148 Cal.App.3d at p. 760 ["where the sole consideration supporting granting the . . . *Faretta* motion is the defendant's willingness to forego a continuance (despite his representations that he considers one necessary) the most prudent course would be to deny the *Faretta* motion rather than condition its grant upon denial of the continuance"].) Once Perez indicated on the record he was *not* prepared to go to trial that afternoon, the court was virtually required to deny the motion or to grant a

*Marsden* motion as he had on several earlier occasions (see fn. 7) or even on the day of trial before his counsel requested a continuance. In light of the events which occurred before and on the day of trial, we can understand why the court reasonably concluded Perez's motion was untimely and that he was in a different situation than the defendants in *People* v. *Tyner* (1977) 76 Cal.App.3d 352, 354-55 [143 Cal.Rptr. 52] and *People* v. *Herrera* (1980) 104 Cal.App.3d 167, 173-175 [163 Cal.Rptr. 435], each of whom asserted a self-representation request on the day of trial without seeking a continuance or indicating in any way that a delay was necessary.

Nonetheless, given the court's finding the motion was untimely, it was required to follow the procedure mandated in *Windham*, by inquiring sua sponte regarding the reasons underlying Perez's request to represent himself. While the court did not specifically make such inquiry, we conclude there were sufficient reasons on the record for the court to exercise its discretion to deny the request. As to the first *Windham* factor, the court was aware of the quality of counsel's representation based upon Judge Revak's denial of Perez's *Marsden* motion the day before the trial. The court was also presumably aware of Perez's "prior proclivity to substitute counsel" given his three previous *Marsden* motions.[9] Additionally, though a jury had not yet been impaneled, trial was about to commence. Thus, the court's granting Perez's motion would have required a continuance (see fn. 10), thereby causing substantial disruption and delay in the proceedings. Finally, as the court noted, Perez's failure to assert the motion the day before when the court denied his *Marsden* motion justified the court's implied finding Perez's request was merely a device to disrupt the proceedings and to continue the

---

continuance if it permitted Perez to proceed in propria persona. Otherwise, we could see an appellate argument in which Perez would assert denial of due process based on his being compelled to represent himself without adequate preparation.

[9]We recognize Perez's success on two of those motions implies they were not made frivolously and had some reasonable basis. However, on at least one of those motions, the conflict requiring substitution was entirely self created when Perez filed a complaint against his attorney with the State Bar. As the court hearing Perez's *Marsden* motion noted: "Well, I'm going to have to relieve [your attorney] because you've discovered a very unique way of getting rid of a lawyer. That's file a complaint against the State Bar. That creates an almost irrefutable conflict of interest. So where one did not exist before, you have personally created on your own." Later at the hearing, the court emphasized "you further understand that if I grant this request based on what I am hearing, this is now the third very capable lawyer you've had. You're going to get a fourth. And the likelihood of your going forward with that fourth is almost a hundred percent because you've used the ploy now of filing a complaint against [your attorney], a very capable lawyer, as a means by which a conflict has arisen. And any future conduct in that regard is going to indicate to a judge that you you're just playing games."

trial. Such circumstances establish sufficient reason for the court to exercise its discretion to deny Perez's untimely motion.[10]

## PEREZ'S NEW TRIAL MOTION

 Perez contends the court erred in denying his new trial motion on the basis of jury misconduct. (See § 1181, subd. 3.)[11]

### A.

After the jury returned its verdict, Perez moved for funding to investigate possible jury misconduct. In support of his motion, defense counsel submitted points and authorities, stating he had questioned "one of the jury members upon their discharge. One juror either Mr. Daniel Carr or Mr. Burt Le Vine related to defense counsel that the jury based its decision of guilt on the fact that the defendant did not testify during the course of the defendant's trial. One of these two jurors stated that several of the jurors mentioned this fact during their deliberations." Neither defense counsel nor any juror submitted a declaration or affidavit stating these or similar facts.

In considering the motion the court made clear it would not rule on the technical basis that counsel had failed to submit a declaration or affidavit. "[I] do not stand on the proposition that there's no declaration. I assume to be true the allegations that Mr. Levine has made not under oath."

The court went on to discuss how it viewed the issue concluding "this type of inquiry is of the sort that is precluded; that a juror may not impeach his or her own verdict on the theory that he or other jurors did not follow the law; that that's exactly what is forbidden and therefore that it is not good cause for funding."

The court then assumed counsel was also seeking a new trial so that the denial of that motion would also be on the record. When defense counsel

---

[10]Our conclusion does not reflect our belief a court is relieved from complying with *Windham* merely because the reasons for the court's exercise of discretion may later be gleaned from the record. *Windham* mandates a court provide the defendant an opportunity to show the specific facts weighing in favor of granting an untimely motion. "A trial court should 'establish[] a record based on [the] relevant considerations' to facilitate appellate review. (*People* v. *Windham, supra,* 19 Cal.3d 121, 128-129.)" (*People* v. *Hill, supra,* 148 Cal.App.3d at p. 759; accord *People* v. *Hernandez, supra,* 163 Cal.App.3d 645, 650-653.) Where, as here, however, the reasons for the denial of the motion are absolutely clear on the record, we conclude there will be no detrimental effect on the justice system for the appellate court to draw the inferences necessarily implied by the court's ruling.

[11]Section 1181, subdivision 3 provides a court may grant a new trial "When the jury has . . . been guilty of any misconduct by which a fair and due consideration of the case has been prevented."

balked at making an oral motion without other evidence which would be obtained in an investigation, the following occurred:

"The Court: I will assume for the sake of argument that all 12 jurors would say that that discussion [regarding appellant's failure to testify at trial] took place.

"Counsel: And I would make a motion for new trial.

"The Court: And it's denied."

## B.

■ When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible. (See Evid. Code, § 1150, subd. (a).) If the evidence is admissible, the court must then consider whether the facts establish misconduct. (See *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 79-82 [137 Cal.Rptr. 863, 562 P.2d 1022].) Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial. (See *People* v. *Marshall* (1990) 50 Cal.3d 907, 950-951 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127].) A trial court has broad discretion in ruling on each of these questions and its rulings will not be disturbed absent a clear abuse of discretion. (See *People* v. *Montgomery* (1976) 61 Cal.App.3d 718, 728-729 [132 Cal.Rptr. 558].)

■ Because we are reviewing the court's exercise of discretion we must accept the premise on which the trial court denied the motion, i.e., that 12 jurors would have signed declarations saying they discussed Perez's failure to testify. We turn first to consider whether such hypothetical jury declarations would be admissible.

■ *In re Stankewitz* (1985) 40 Cal.3d 391, 397 [220 Cal.Rptr. 382, 708 P.2d 1260] sets forth the general principles governing the admissibility of juror declarations to impeach a verdict. " 'Upon an inquiry as to the validity of a verdict, *any otherwise admissible evidence may be received as to statements made*, or conduct, conditions, or events occurring, either within or without the jury room, *of such a character as is likely to have influenced the verdict improperly.*' (Evid. Code, § 1150, subd. (a) . . . .) It is settled that jurors are competent to prove 'objective facts' under this provision. (*People* v. *Hutchinson* [1969] 71 Cal.2d at p. 351 [78 Cal.Rptr. 196, 455 P.2d 132].) By contrast, the Legislature has declared evidence of certain other facts to be

inadmissible for this purpose: 'No evidence is admissible to show the *effect* of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent form the verdict or concerning the mental processes by which it was determined.' (Evid. Code, § 1150, subd. (a) . . . .) Thus, jurors may testify to 'overt acts'—that is, such statements, conduct, conditions, or events as are 'open to sight, hearing, and the other senses and thus subject to corroboration'—but may not testify to 'the subjective reasoning processes of the individual juror . . .' (*People* v. *Hutchinson, supra,* at pp. 349-350.) [¶] Among the overt acts that are admissible and to which jurors are competent to testify are statements. Section 1150, subdivision (a), expressly allows proof of 'statements made . . . either with in or without the jury room . . .' " (*Stankewitz, supra,* 40 Cal.3d at pp. 397-398.)

*Stankewitz* held a declaration regarding a juror's erroneous legal advice to his fellow jurors during deliberations was admissible since the juror's advice constituted an overt act of misconduct. The court cautioned, however, that juror statements "have a greater tendency than nonverbal acts to implicate the reasoning process of jurors . . . . They are therefore more apt to be misused by counsel in an effort to improperly open such processes to scrutiny." (*Stankewitz, supra,* 40 Cal.3d at p. 398.) *Stankewitz* nonetheless made clear that "no such misuse is threatened when, as here, *the very making of the statement sought to be admitted would itself constitute misconduct.* Such an act is as much an objective fact as a juror's reading of a novel during the taking of testimony [citation] or a juror's consultation with an outside attorney for advice on the law applicable to the case [citation]." (*Ibid.,* italics added; see *People* v. *Hedgecock* (1990) 51 Cal.3d 395, 419 [272 Cal.Rptr. 803, 795 P.2d 1260] ["a statement by a juror during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible"].)

Consistent with *Stankewitz,* several courts have held evidence of a jury discussion on an improper topic to be admissible as an "overt act," provided the evidence is not directed at the subjective reasoning processes of the individual juror. (See e.g., *DiRosario* v. *Havens* (1987) 196 Cal.App.3d 1224, 1238 [242 Cal.Rptr. 423] [statements between jurors regarding the court's authority to reduce an excessive jury award are overt acts that are admissible and to which jurors are competent to testify]; *Moore* v. *Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 740 fn. 8, 742-743 [223 Cal.Rptr. 859] [holding admissible declarations reflecting juror statements disregarding court's admonition not to draw any inference of liability from a party's out-of-court settlement]; *Trammell* v. *McDonnell Douglas Corp.* (1984) 163 Cal.App.3d 157, 172 [209 Cal.Rptr. 427] [holding juror comments during deliberations regarding effect of attorney's fees and income

taxes on damage award "is overt conduct, objectively ascertainable . . . ."].)

■ Here, the court was asked to exercise its discretion in ruling on Perez's new trial motion. In so doing the court accepted a worst case scenario, explicitly assuming all jurors discussed Perez's failure to testify. In effect, the court envisioned the jury had explicitly or implicitly agreed to disregard the court's express instruction not to consider or discuss Perez's failure to take the witness stand.[12] Such jury discussion is admissible to impeach the verdict under the express provisions of Evidence Code section 1150. As in *Stankewitz, DiRosario, Moore* and *Trammell*, the discussion is an overt act, "open to sight, hearing, and the other senses and thus subject to corroboration." (See *People* v. *Hutchinson, supra,* 71 Cal.2d 342, 350; Evid. Code, § 1150, subd. (a); see also *Brown* v. *State* (Tex.Ct.App. 1991) 804 S.W.2d 566, 569 ["a jury's discussion of an accused's failure to testify would constitute an overt act of misconduct . . ."].)[13] More importantly, evidence of a jury's explicit or implicit agreement to violate a court's instruction does not touch upon the juror's subjective reasoning processes, since, as in *Stankewitz*, such agreement in and of itself constitutes misconduct. (See *DiRosario* v. *Havens, supra,* 196 Cal.App.3d at p. 1235 ["if the jurors in this case made their decision based upon an intentional collective disregard of [a jury instruction] . . . then such activity would be grounds for seriously considering reversal of the judgment"]; *People* v. *Elkins* (1981) 123 Cal.App.3d 632, 638 [176 Cal.Rptr. 729] [finding juror affidavits inadmissible since the declarations failed to "indicat[e] . . . any open discussion or agreement among the jurors evidencing a deliberate refusal to follow the court's instructions"]; see also *Krouse* v. *Graham, supra,* 19 Cal.3d 59, 81; see also *People* v. *Hill* (1992) 3 Cal.App.4th 16, 37-38, [4 Cal.Rptr.2d 258].)

Given the court's scenario that 12 jurors effectively agreed to disregard the court's express instructions, the jury declarations would have been admissible and constituted clear evidence of misconduct. While the court has broad discretion to rule on a new trial motion, that discretion was abused

[12]The court specifically instructed the jury as follows: "It is a constitutional right of the defendant in a criminal trial that he may not be compelled to testify. You must not draw any inference from the fact that the defendant does not testify. *Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way.*" (Italics added.)

[13]At least one federal court and several courts in other jurisdictions have ruled to the contrary, holding that juror declarations regarding the jury's discussion of the defendant's failure to testify are inadmissible to impeach a verdict. (See *United States* v. *Pavon* (D.C.Fla. 1985) 618 F.Supp. 1245; *State* v. *Walker* (Mo.Ct.App. 1990) 783 S.W.2d 145; *Sims* v. *State* (Fla. 1983) 444 So.2d 922; *State* v. *Myers* (1974) 215 Kan. 600 [527 P. 2d 1053, 1057].) Those decisions, however, are inapposite, since under federal law and the law of each of those states the type of evidence which is admissible to impeach a verdict is substantially more limited than under California law.

here, where the court denied the motion on a factual scenario presumptively establishing prejudicial jury misconduct.

## C.

Our conclusion the court prejudicially erred in denying the new trial motion requires that we vacate the judgment and remand for further proceedings. On remand we wish to emphasize the trial court should not assume 12 jurors actually discussed Perez's failure to testify. Although we appreciate a substantial period of time has expired since the jury in this case was discharged and obtaining declarations from some or all of the jurors may be difficult or impossible, we do not believe the court's earlier error relieving defense counsel of this burden should result in any other procedure than that required by law.

## SENTENCING

After the jury returned its verdict, the court found Perez suffered two serious felony priors within the meaning of section 667, subdivision (a)[14] and two prison priors within the meaning of section 667.5, subdivision (b).[15] The court sentenced Perez to sixteen years in prison: the middle term of four years for assault with a deadly weapon by a prisoner; two consecutive five-year enhancements for serious felony priors and two consecutive one-year enhancements for his two prison priors.

Perez makes two distinct sentencing arguments. The first is that the court improperly enhanced his sentence by imposing an additional one year for each of the prison priors because each such enhancement violates the rule against double punishment under section 654. He explains a single prison term for each of the prior serious felonies was included within the single term for which he is now serving a five-year enhancement.

---

[14]Section 667, subdivision (a) provides "any person convicted of a serious felony who previously has been convicted of a serious felony . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively."

[15]Section 667.5 provides in part, "Enhancement of prison terms for new offenses because of prior prison terms shall be imposed as follows . . . [¶] (b) . . . where the new offense is any felony for which a prison sentence is imposed, in addition and consecutive to any other prison terms therefor, the court shall impose a one-year term for each prior separate prison term served for any felony; . . . [¶] (g) [a] prior separate prison term for the purposes of this section shall mean a continuous completed period of prison incarceration imposed for the particular offense alone or in combination with concurrent or consecutive sentences for other crimes, including any reimprisonment on revocation of parole which is not accompanied by a new commitment to prison, and including any reimprisonment after an escape from incarceration."

Perez makes this argument on the basis of *People* v. *James* (1985) 170 Cal.App.3d 164 [216 Cal.Rptr. 24] where the court held imposition of a five-year prior serious felony enhancement for one offense and a one-year prior prison term enhancement for another offense violated section 654 when time for the two offenses had been served concurrently. *People* v. *Vaughn* (1989) 209 Cal.App.3d 398, 401 [257 Cal.Rptr. 229], however, held otherwise, declining to follow *James,* describing it "wrongly decided based on an improvident concession by the Attorney General." (See also *People* v. *Medina* (1988) 206 Cal.App.3d 986, 989-990 [254 Cal.Rptr. 89] [refusing to follow *James*].) *Vaughn* explains: "[t]he reasoning in . . . *James* . . . is flawed in that a serious felony enhancement under section 667 depends solely on the nature of the felony conviction irrespective of whether a prison term was served. (*People* v. *Traina* (1985) 168 Cal.App.3d 305, 308 . . . .) Under section 667.5, the service of a prior prison term is the critical event which triggers imposition of an additional one-year term. Under section 667, the 'act' within the meaning of section 654 for prior conviction enhancements is the conviction. Under section 667.5, the enhancement requires service of a prison term and the 'act' is the conviction *plus* service of the prison term. In this case, there were two separate acts: (1) the *conviction* of a serious felony within the meaning of section 667 in . . . 1981; and (2) the conviction of an unrelated felony . . . [in] 1982 *and* the *service* of a prison term within the meaning of section 667.5. That the prison term for 1981 serious felony conviction 'overlapped' the section 667.5 prison term imposed for the 1982 burglary is immaterial as defendant's sentence was enhanced by two entirely separate 'acts.' " (*Id.* at p. 402.)

We believe *Vaughn* was correctly decided. (See *People* v. *Irvin* (1991) 230 Cal.App.3d 180, 189 [281 Cal.Rptr. 195] ["A defendant may be sentenced for a prior serious felony conviction and then also sentenced for a prior prison term for a different prior offense even though the convictions occurred at the same time and the sentences were served together"]; *People* v. *Medina, supra,* 206 Cal.App.3d 986, 989 ["we hold that a single previous prison commitment for two or more serious felony offenses may serve as the basis for sentence enhancements pursuant to both section 667 and section 667.5."].) The court did not violate the rule against double punishment by enhancing Perez's sentence with his serious prior conviction and his prison priors.

 Perez's other sentencing argument is that the court erred in sentencing him to the two 1-year enhancements because both were the result of one continuous period of confinement in state prison correctly pointing out that section 667.5, subdivision (b) provides that the additional one-year enhancement for a prior prison sentence may only be imposed for each earlier

separate prison term served for any felony. (See *Medina, supra,* 206 Cal.App.3d at p. 991.) The Attorney General, however, argues that the terms Perez served on the two priors were separate. On the record before us we reach a contrary conclusion.

The probation report shows the first prison prior involved a case where the court ordered Perez to serve five years on a burglary conviction, commencing in August 1983. The second prison prior involved a case where Perez was first committed to California Rehabilitation Center for treatment in October 1979. Later he was released, returned to that facility on several occasions but ultimately in April 1983 was excluded from the program and sent to prison. Thus Perez's prison sentence on both priors involved a single "block of time." "The plain meaning of section 667.5, subdivision (g) is to prevent multiple one-year enhancements under section 667.5 itself where the offender has served one period of prison confinement, or block of time, for multiple offenses or convictions. Extra section 667.5 enhancements may only be added for additional periods of prison confinement." (*People* v. *Medina, supra,* 206 Cal.App.3d 986, 992.) We therefore hold Perez may only be sentenced for one of the earlier priors, and accordingly we strike one year from his sixteen-year sentence.

### Disposition

The judgment is modified by striking the one-year sentence imposed for a prison prior. As modified the judgment is affirmed. The abstract of judgment and the records at the Department of Corrections shall be modified accordingly. The case is remanded to the trial court for further proceedings consistent with this opinion.

Todd, J., and Nares, J., concurred.

A petition for a rehearing was denied April 3, 1992, and appellant's petition for review by the Supreme Court was denied June 11, 1992.