Filed 6/17/14  P. v. Leon CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>FRANCISCO JULIAN MONCADA LEON,<br><br>        Defendant and Appellant. | B247169<br><br>(Los Angeles County<br>Super. Ct. No. PA058799) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Harvey Giss, Judge.  Affirmed.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson and Mark E. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Defendant Francisco Julian Moncada Leon appeals from a judgment of conviction entered after a jury found him guilty of one count of first degree murder (Pen. Code,[1] § 187, subd. (a)) and the trial court sentenced him to a state prison term of 25 years to life. Leon challenges the denial of his June 28, 2012 *Faretta*[2] motion. Leon also seeks correction of his presentence custody credits, based on documents in Spanish from Mexico, to include 306 days he was incarcerated in Mexico prior to his extradition to the United States. We affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *The Crime*

Leon and Erika Chavez had a romantic relationship from 2000 to 2006, and they had two children together. Leon had a history of violence toward Chavez.

During the fall of 2006, Leon began dating Janet Martinez, a 25-year-old mother of two who lived with her mother. On November 3, 2006 Leon and Martinez were having sexual intercourse when Martinez asked Leon to slow down because he was hurting her. Leon became upset, threatened Martinez, beat her, and repeatedly sexually assaulted her. Leon drove Martinez to her home. When she tried to get out of the car, Leon pulled her back in by her hair and threatened her with a knife. He drove her to another location and freed her.

Martinez went to a police station and reported what occurred. The police took her to the hospital for examination. While she was in the hospital, she received several telephone messages from Leon asking for her forgiveness. A few days later, Martinez

---

[1] All statutory references are to the Penal Code except as otherwise identified.

[2] *Faretta v. California* (1975) 422 U.S. 806, 835-836 [95 S.Ct. 2525, 45 L.Ed.2d 562].

2

told her friend Noemi Ronzan that she had forgiven Leon, and the two of them went to the police station to remove the restraining order Martinez had obtained against Leon. Martinez told the police that she was recanting her statements that Leon had beaten and sexually assaulted her, and she signed a complaint refusal form.

Two weeks after Leon had beaten and sexually assaulted Martinez, they married. Then they moved in together with Martinez's children to a house in Pacoima.

On Friday, January 26, 2007 Martinez's children went to spend the weekend with their father. On Sunday, January 28 the children's father took them to the home of Martinez's mother, where Martinez was supposed to pick them up that evening. Martinez did not come to pick up her children.

Leon called Chavez on Monday, January 29, 2007, and told her he needed money to get out of town. He said he had choked Martinez during a fight, and when he left she was not breathing. Leon later telephoned Chavez and told her that he was living in Mexico with his mother.

On February 1, 2007 Martinez's mother and other family members went to the house where Martinez and her children lived. They found Martinez's body on the floor, with a towel and an article of clothing wrapped tightly around her neck. Martinez had died from asphyxia caused by strangulation.

Leon was apprehended in Mexico and extradited to Los Angeles, where police detectives interviewed him. Leon told the detectives that he and Martinez had gone dancing at a disco and ran into a waitress he had dated before. Martinez became upset and, at her request, Leon took her home. Martinez removed her clothes from the closet, and Leon took a shower. While he was drying himself with a towel, Martinez told Leon that she did not like his son, she had had sexual relations with her boss and her boss' assistant, and she had married Leon to get out of her mother's house. Martinez bit and scratched Leon. Leon grabbed the towel and pulled it hard around Martinez. She fainted to the floor, which scared Leon, so he decided to leave. Martinez was still breathing when he left. The next day Leon drove to Las Vegas, abandoned the car, and took a bus to Mexico. During the interview with detectives, Leon identified the towel that he had

used.  He said he was remorseful and "deserve[d] a punishment," because he had committed a mistake.

B.      *The Marsden and Faretta Motions*

The court appointed Deputy Public Defender Christopher Sharpe to represent Leon.  The court's Spanish-language interpreters translated for Leon throughout the proceedings.

On February 23, 2010 Leon made a motion under *People v. Marsden* (1970) 2 Cal.3d 118 to replace Sharpe as his attorney, claiming that Sharpe was not representing him well.  After hearing from Leon and Sharpe, the court stated that Sharpe was defending Leon properly and denied the *Marsden* motion without prejudice.  Leon then asserted he had a right to self-representation, but he did not pursue the matter.

Sharpe represented Leon at the felony preliminary hearing on June 17, 2010.  On June 22 the People filed an information charging Leon with murder.  Sharpe represented Leon at his July 1 arraignment.

On January 11, 2011 Leon told the court Sharpe had a conflict of interest.  The court held a second *Marsden* hearing, but Leon did not identify any disqualifying conflict of interest.  The court denied the motion without prejudice.

On August 16, 2011 Sharpe informed the trial court that Leon wanted to have a new attorney appointed to represent him.  The court held a third *Marsden* hearing and denied the motion without prejudice.  During the *Marsden* hearing, Leon told the court that he wanted to exercise his *Faretta* rights to represent himself.  The court explained the disadvantages of self-representation and gave Leon *Faretta* advisements substantially similar to those the Supreme Court held in *People v. Lawley* (2002) 27 Cal.4th 102, 141-142 were adequate.[3]  Leon repeated that he wanted to represent himself.  When the court

---

[3]      The court advised Leon as follows:
     "One, self representation is almost always unwise and the defense may be conducted to your detriment.

4

asked Leon how long he thought he would need to prepare for trial, Leon said, "Maybe a year." The court gave Leon the requisite form to complete for his *Faretta* motion and directed the interpreter to assist Leon with the form. After a recess, the interpreter informed the court Leon wanted to think about it overnight. At a hearing the next day, Leon said he wanted the public defender to continue representing him.

---

"Two, you are entitled to no special indulgence from the court and must follow all technical rules of substantive law, procedure, and evidence in making motions, presenting evidence, and conducting jury selection and argument. The same rules that govern the lawyers will control and restrict you and I will give you no additional help. You'll have to abide by rules that took years for the lawyers to learn.

"Three, the prosecution will be represented by an experienced professional lawyer who will give you no ground for the lack of your skills or experience. It will not be a fair fight.

"Four, there will be no more library privileges than those available to all other pro pers and there will be no extra time for preparation or staff investigators at your beckoned [*sic*] call.

"Five, if your rights are terminated for misconduct or the inability to proceed in a timely manner, I'll have stand-by counsel ready to represent you. But that stand-by counsel will be at a terrible disadvantage because I will not give stand-by counsel an opportunity to prepare as if he was coming on new or fresh to the case. He'll have to pick up from where you are leaving off. It will be a terrible disadvantage. But I will appoint stand-by counsel. Meaning that if you lose your nerve or wish to, wish to relinquish your right to represent yourself, he'll step in. If it's right before trial is to begin, I'm not going to give that person more time to prepare. And if it's during the middle of trial that person will have to pick up without missing a beat and take over.

"If you're incarcerated, which you are, your access to the law library and other privileges may be subject to limitations if you misbehave or there is trouble in jail. You will not have advisory counsel. There will not be somebody else trying it with you as co-counsel or your co-pilot.

"If you are disruptive in court I can yank your right to represent yourself and appoint stand-by counsel. And, finally, if you're convicted while representing yourself, there will be no right to appeal based on your ineffectiveness of counsel or the court allowing you to represent yourself.

"Do you understand all of this?

"THE DEFENDANT: Yes."

On February 8, 2012, the date set for trial, Leon made a fourth *Marsden* motion, which the court set for hearing on February 14, 2012. At the February 14 hearing, Sharpe told the court that Leon had withdrawn his *Marsden* motion.

At the next hearing on March 15, 2012, Leon told the court he wanted to exercise his *Faretta* rights to represent himself. The court made arrangements for an interpreter to read the *Faretta* form to Leon and asked Leon to check the boxes and sign the form. After a recess, the court held the *Faretta* hearing and noted that Leon had previously requested to represent himself in February 2010 and August 2011 and that on both occasions Leon had changed his mind and agreed that Sharpe would continue to represent him. The court again gave Leon extensive *Faretta* warnings about the disadvantages of self-representation. When the court asked Leon if he wanted to represent himself, Leon stated: "If you can assign me another lawyer that would be the best." When the court asked Leon if he was making a *Marsden* motion, Leon gave some general reasons why he wanted the court to relieve Sharpe. The court denied the *Marsden* motion (Leon's fifth).

Leon then repeated his request to represent himself under *Faretta* and provided the court with a signed *Faretta* advisement and waiver of right to counsel form. Both the trial court and Sharpe advised Leon that his inability to understand English would cause additional difficulties. The court gave Leon another lengthy advisement of the risks of self-representation. Leon confirmed he still wanted to represent himself. The court released Sharpe and the office of public defender as counsel for Leon. The court found that Leon "voluntarily and intelligently chooses self-representation, and that he knowingly, intelligently, understandingly, and explicitly waives his right to counsel, and determines that [he] is competent to represent himself."

On March 23, 2012 Leon appeared, representing himself. The court appointed stand-by counsel. The court granted in part Leon's motion for ancillary funds, granted Leon's motion to appoint an investigator, and set a pretrial conference for April 20, 2012. At the April 20 pretrial conference, however, Leon stated that he did not understand the system because it was too complicated and demanded counsel. The court reappointed Sharpe.

After several more continuances, Leon on June 28, 2012 made a sixth *Marsden* motion to relieve Sharpe as his counsel. After inquiring about the basis of Leon's *Marsden* motion, the court denied it. Leon then stated, "I'm going to exercise my fair rights." The court interpreted the statement as another *Faretta* motion for self-representation, Leon's fourth. The court denied the motion, stating that granting the motion would interfere with the speedy presentation of the trial. The court explained that Leon had represented himself once and had indicated he did not understand the procedures and did not know what he was doing, and that he had asked the court to reappoint his attorney, although the court stated it was not denying the motion because Leon lacked the skill to represent himself. The court expressed concern that the offense had occurred in 2007, two years had already passed since Leon's arraignment, and trial was set for August 6, 2012. The court found that granting Leon's *Faretta* motion would interfere with the presentation of the case in a speedy manner because it would take six to eight months for Leon to get ready for trial. The trial court stated: "It would take you far too long and will play ping-pong with your representation . . . where you constantly wish to release counsel. It will not happen again because we're so close to trial."

The trial ultimately began on January 23, 2013, with Sharpe representing Leon. As noted above, the jury convicted Leon of first degree murder.

## DISCUSSION

A.   *The Trial Court Did Not Abuse Its Discretion in Denying Leon's Fourth*
     *Faretta Motion*

1.   Introduction

In *Faretta v. California*, *supra*, 422 U.S. 806, the United States Supreme Court held that, under the Sixth Amendment of the federal Constitution, a criminal defendant has a "constitutional right to conduct his own defense." (*Id.* at p. 836.) The right to self-representation is independent of the guarantees of the Sixth and Fourteenth Amendments "that a person brought to trial in any state or federal court must be afforded the right to

7

the assistance of counsel before he can be validly convicted and punished by imprisonment." (*Id.* at p. 807.) However, "the right of self-representation is not absolute." (*Indiana v. Edwards* (2008) 554 U.S. 164, 171 [128 S.Ct. 2379, 171 L.Ed.2d 345]; see *People v. Butler* (2009) 47 Cal.4th 814, 825.) "'A trial court must grant a defendant's request for self-representation if the defendant knowingly and intelligently makes an unequivocal and timely request after having been apprised of its dangers.' [Citation.]" (*People v. Williams* (2013) 58 Cal.4th 197, 252-253.) Thus, "*Faretta* motions must be both timely and unequivocal." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1002; see *Williams*, *supra*, at p. 252.)

Leon does not challenge the trial court's denial of his six *Marsden* motions, nor does he raise any issue regarding the trial court's granting of his March 15, 2012 *Faretta* motion. (See *People v. Williams* (2013) 56 Cal.4th 165, 193-194 [trial court did not err in granting the defendant's *Faretta* motion and allowing the defendant to represent himself at the penalty phase].) Leon's only argument is that the trial court abused its discretion by denying his fourth *Faretta* motion as untimely.

### 2. Leon's *Faretta* Motion Was Untimely

While a timely, unequivocal *Faretta* motion invokes "the nondiscretionary right to self-representation," an untimely *Faretta* motion does not. (*People v. Lawrence* (2009) 46 Cal.4th 186, 191-192; see *People v. Lynch* (2010) 50 Cal.4th 693, 721, 722 ["[a] trial court must grant a defendant's request for self-representation" if it is timely, but may deny the request "if untimely]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1365 [if a *Faretta* motion is untimely, "self-representation no longer is a matter of right but is subject to the trial court's discretion"].) In determining whether a *Faretta* motion is untimely, "a trial court may consider the totality of the circumstances," including "not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to

8

assert his right of self-representation." (*Lynch*, *supra*, at p. 726.) "[T]he trial court's determination of untimeliness necessarily must be evaluated as of the date and circumstances under which the court made its ruling . . . ." (*People v. Marshall* (1997) 15 Cal.4th 1, 25, fn. 2.)

The trial court here properly considered the appropriate factors and found, under the totality of the circumstances, that Leon's fourth *Faretta* motion was untimely. At the time of the motion on June 28, 2012, the criminal proceedings had been pending for almost two years, and the alleged crime had occurred more than five years before, in January 2007. The trial date had been continued multiple times, from February 8, 2012 to August 6, 2012, in part because of Leon's serial *Marsden* and *Faretta* motions. (See *People v. Perez* (1992) 4 Cal.App.4th 893, 904 [court could consider the defendant's "'prior proclivity to substitute counsel' given his three previous *Marsden* motions"].) There is no indication that Sharpe was not ready to proceed to trial. In fact, in connection with Leon's various *Marsden* motions, Sharpe advised the trial court he knew the case "inside and out," had a defense theory, and, although Leon had confessed, Sharpe intended to defend him and force the prosecution to prove its case. After the court denied the *Faretta* motion, the court asked if the August 6 trial date was "still realistic," and Sharpe stated that it was, which further confirms that Sharpe was ready to proceed to trial.

Although the People charged Leon with only one crime, the first degree murder of his wife, the case was relatively complex, at least from the defense perspective, because Leon was facing a life sentence for a crime to which he had voluntarily confessed twice. During the six-day trial, 16 witnesses testified, including Chavez, two nurse practitioners, and an investigator and forensic pathologist from the coroner's office. Although there is no indication that any of the key witnesses had any health or availability issues, the trial court's comments suggest that the court was properly concerned that further delay of the trial might decrease the accuracy of the witnesses' recollections of the events before and after the crime. (See *People v. Lynch*, *supra*, 50 Cal.4th at p. 728.) The trial court noted in connection with one of the *Marsden* hearings that the issue whether Leon could

suppress the confession "and how it [could] be used," and the issues relating to the DNA evidence, were sophisticated legal issues that Leon would have difficulty understanding and arguing to the court. And, as summarized above, the pretrial proceedings were extensive and included six *Marsden* motions, three prior *Faretta* motions, a period of time when Leon represented himself, and then a reinstatement of appointed counsel. During these pretrial proceedings, Leon not only had the opportunity to assert his right to self-representation, he actually did assert this right, and he did so successfully. These factors weighed heavily in favor of finding that the second assertion of his right to self-representation was untimely.

It is true that at the time of Leon's fourth *Faretta* motion, the most recently-continued trial date was just over a month away. The Supreme Court has held, however, that its "refusal to identify a single point in time at which a self-representation motion filed before trial is untimely indicates that outside these two extreme time periods" of long before trial and on the eve of trial, "pertinent considerations may extend beyond a mere counting of the days between the motion and the scheduled trial date." (*People v. Lynch*, *supra*, 50 Cal.4th at p. 723.) "*Faretta* nowhere announced a rigid formula for determining timeliness without regard to the circumstances of the particular case." (*Id.* at p. 724.) "[T]imeliness for purposes of *Faretta* is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made. An analysis based on these considerations is in accord with the purpose of the timeliness requirement, which is 'to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice.' [Citation.]" (*Ibid.*) Indeed, in *People v. Lynch* the Supreme Court held that, in the circumstances of that case, the two *Faretta* motions filed "months before trial began" were untimely. (*Id.* at pp. 726, 770.)[4]

---

[4] Leon cites several federal cases in which, he claims, the reviewing court found that a request for self-representation was timely when made "weeks before trial" (*Faretta v. California*, *supra*, 422 U.S. at p. 835; *Marshall v. Taylor* (9th Cir. 2005) 395 F.3d 1058, 1061), "before the jury was empaneled" unless a delay tactic (*Armant v. Marquez*

10

Because Leon's fourth *Faretta* motion was untimely, the trial court had discretion to deny the motion. (See *People v. Lynch*, *supra*, 50 Cal.4th at p. 728 ["defendant's self-representation motions were properly deemed untimely," and "[t]hus, the trial court had discretion to deny the motions"].) Therefore, the remaining question is whether the trial court abused its discretion in denying the motion.

### 3. The Trial Court Did Not Abuse Its Discretion in Denying Leon's Untimely *Faretta* Motion

In exercising its discretion to rule on an untimely *Faretta* motion, "the trial court should consider factors such as '"the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion."' [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 959; see *People v. Williams*, *supra*, 56 Cal.4th at p. 194.) The trial court need not explicitly consider each factor, as long as the record contains sufficient evidence to support implicit consideration of the factors. (*People v. Scott* (2001) 91 Cal.App.4th 1197, 1206; see *People v. Marshall* (1996) 13 Cal.4th 799, 828 ["[a]though in denying defendant's *Faretta* motion the trial court relied heavily on the absence of any showing counsel was incompetent, the record reflects its explicit or implicit consideration of each of the other . . . factors"].) "'[A] reviewing court must give "considerable weight" to the court's exercise of discretion and must examine the total

---

(9th Cir. 1985) 772 F.2d 552, 555), "'before meaningful trial proceedings have commenced'" and "on the morning of trial" (*Fritz v. Spalding* (9th Cir. 1982) 682 F.2d 782, 784). California, however, does not follow the federal rule for evaluating whether a *Faretta* motion is untimely. (See *People v. Burton* (1989) 48 Cal.3d 843, 854 ["[t]o the extent that there is a difference between the federal rule and the California rule [for timeliness of *Faretta* motions], we find the federal rule too rigid in circumscribing the discretion of the trial court and adhere to the California rule"]; see *People v. Ngaue* (1991) 229 Cal.App.3d 1115, 1124 [California *Faretta* timeliness rule "vest[s] greater discretion in the trial court"].)

11

circumstances confronting the court when the decision is made.' [Citation.]" (*People v. Bradford* (2010) 187 Cal.App.4th 1345, 1353.)

The record shows that the trial court considered the relevant factors and did not abuse its discretion in denying Leon's fourth *Faretta* motion. At the hearings on Leon's multiple *Marsden* motions, the trial court assessed and praised the quality of Sharpe's representation of Leon. (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 959-960.) The trial court found that Sharpe "has properly represented [Leon] and will continue to do so," that Sharpe had "discussed [the] matter with [Leon] . . . at great length," and was qualified and had a good reputation. The trial court told Leon that the court had experience with Sharpe in previous matters and observed that Sharpe was "a top flight lawyer."

The trial court also considered Leon's "'prior proclivity to substitute counsel,'" which "is a legitimate factor for the court to consider in connection with an assertion of the right to self-representation." (*People v. Lancaster* (2007) 41 Cal.4th 50, 69.) Leon was initially represented by counsel, then attempted unsuccessfully multiple times to substitute counsel, and then successfully moved to represent himself, but he soon became frustrated and successfully moved to have counsel reinstated. When the trial court reappointed the same attorney who had previously represented him, Leon again attempted to substitute counsel. The reasons Leon gave for making the motion were that Sharpe had been lying to him, had failed to communicate with him, and had not interviewed witnesses. When the trial court denied this *Marsden* motion, Leon stated that he did not agree and was going to make a *Faretta* motion. Leon did not state any reasons for the *Faretta* motion, other than he disagreed with the court's ruling on the *Marsden* motion. The trial court was properly concerned about Leon's "repeated alternation between self-representation and the services of counsel" and found that this was an additional reason to deny Leon's fourth *Faretta* motion. (*Ibid.*; see *People v. Roldan* (2005) 35 Cal.4th 646, 684 [prior *Faretta* motions evidenced a proclivity to substitute counsel and weighed in favor of denying fourth *Faretta* motion], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Lawley*, *supra*, 27 Cal.4th at p. 150 [defendant's previous dismissal of his attorney "yield[ed] the inference he had . . . a

proclivity to substitute counsel" and supported trial court's denial of *Faretta* motion];
*People v. Perez*, *supra*, 4 Cal.App.4th at p. 904 [three prior *Marsden* motions, two of which were successful, evidenced a proclivity to substitute counsel].)

As to the expected disruption and delay that reasonably would ensue had the trial court granted Leon's fourth *Faretta* motion, the trial court properly found that disruption and delay were likely. In connection with an earlier *Faretta* motion, Leon had told the court that if he proceeded to represent himself, he would need a year to prepare for trial. Leon undoubtedly would require a similar extension of time. Leon also gave the court no reason at the June 28, 2012 hearing to believe that he would not again experience frustration at the complexity of the criminal justice system and ask the court again to reappoint counsel for him. It was reasonably foreseeable if not a certainty that relieving Sharpe and granting Leon's request to represent himself again would cause additional substantial delay. The trial court stated: "It's interfering with the speedy presentation of the trial. . . . I feel that because of the nature and gravity of the offense that for you to get ready would now take six to eight months . . . . It's interfering with the presentation of this case in a speedy manner. . . . So respectfully your motion to represent yourself is denied." The trial court also noted Leon's fourth *Faretta* motion would create a "ping-pong" game of retaining, releasing, retaining, and releasing appointed counsel that would further delay the trial. As the California Supreme Court has stated, *Faretta* "held generally that a defendant may represent himself. It did not establish a game in which defendant can engage in a series of machinations, with one misstep by the court resulting in reversal of an otherwise fair trial." (*People v. Clark* (1992) 3 Cal.4th 41, 115; see *People v. Horton* (1995) 11 Cal.4th 1068, 1111 [defendant not entitled to delay the trial "'by juggling his *Faretta* rights with his right to counsel interspersed with *Marsden* motions'"].) In *People v. Lynch*, *supra*, 50 Cal.4th 693 the California Supreme Court stated, in words equally applicable to this case, that the trial court had not abused its discretion by denying the motion on the grounds that a case "that had endured significant delay was finally nearing resolution," (*id*. at p. 727) and that granting the motion would require giving the defendant additional time "to investigate and prepare" and "was

13

reasonably likely to result in substantial delay and disruption of the proceedings." (*Id.* at p. 728.)

The circumstances of Leon's fourth *Faretta* motion also suggest that the primary motivation for the motion was not to represent himself again, which he admitted had been a difficult and frustrating experience. Leon repeatedly informed the court that he wanted an attorney other than Sharpe. Leon made his *Faretta* motions only when the court denied his motions for a different court-appointed attorney. From this fact the trial court reasonably could have inferred that Leon was making the motion out of frustration rather than a genuine desire to represent himself. (See *People v. Butler*, *supra*, 47 Cal.4th at p. 825 [trial court "may deny a request for self-representation that is . . . made in passing anger or frustration"]; cf. *People v. Stanley* (2006) 39 Cal.4th 913, 932-933 [oral request "for self-representation during a renewed *Marsden* motion . . . out of apparent annoyance or frustration with his first appointed counsel" was evidence that defendant's waiver of counsel was not knowing and intelligent].)

Finally, even assuming the trial court abused its discretion in denying Leon's fourth *Faretta* motion, Leon suffered no prejudice from the denial. Although an erroneous denial of a timely *Faretta* motion for self-representation is reversible per se (*People v. Williams*, *supra*, 58 Cal.4th at p. 253; *People v. Butler*, *supra*, 47 Cal.4th at p. 824), an erroneous denial of an untimely motion for self-representation is reviewed for harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Rogers* (1995) 37 Cal.App.4th 1053, 1058; *People v. Nicholson* (1994) 24 Cal.App.4th 584, 594-595; *People v. Rivers* (1993) 20 Cal.App.4th 1040, 1050.) Here, the evidence against Leon was overwhelming. Leon confessed twice, once to the detectives that he had strangled Martinez with a towel and once to Chavez that he had choked Martinez and that she had stopped breathing. Leon identified for the police the towel he had used to strangle Martinez and admitted he deserved to be punished. In addition, the jury convicted Leon after a trial in which Leon was represented by counsel, whose performance the trial court had praised. It is difficult to envision how Leon could have obtained a better result had he represented himself. (See *Martinez v. Court of App. of*

14

*Cal.* (2000) 528 U.S. 152, 161 [120 S.Ct. 684, 145 L.Ed.2d 597] ["[o]ur experience has taught us that 'a pro se defense is usually a bad defense, particularly when compared to a defense provided by an experienced criminal defense attorney'"]; *Faretta v. California*, *supra*, 422 U.S. at p. 834 ["in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts"]; *People v. Blair* (2005) 36 Cal.4th 686, 740 ["'the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant'"]; *People v. Rivers*, *supra*, 20 Cal.App.4th at p. 1051 ["a defendant who represents himself virtually never improves his situation or achieves a better result than would trained counsel"].) Given the record in this case, it is not reasonably probable that, had Leon represented himself, he would have obtained a better result.

> B. *Leon Is Not Entitled to a Recalculation of his Custody Credits on Appeal*

Leon asks us to take judicial notice of a document he claims shows the number of days he was in custody in Mexico before his extradition to the United States. On the basis of this evidence, he requests that we increase his presentence custody credit from 1,281 actual days to 1,587 actual days.

The document is in Spanish with handwritten annotations on it, accompanied by an English translation and a declaration of a translator. In his request for judicial notice, Leon represents that the document is from the Mexican General Office of Legal Affairs, Division of International Legal Assistance and the Office of the Mexican Attorney General Federal Investigations Agency. Leon argues that the document shows he was taken into custody in Mexico for the charges in this case on October 23, 2008, and therefore he is entitled to 306 more days of presentence custody credits than the trial court awarded. In a letter brief filed with this court on December 10, 2013, Leon's appellate counsel represents that at a hearing on April 5, 2013, the trial court declined to award such credit on the basis that it did not have jurisdiction to correct the credit because Leon had filed a notice of appeal.

15

Leon provides no explanation, however, for why he did not and could not have presented the document to the trial court prior to sentencing. "An appellate court may properly decline to take judicial notice under Evidence Code sections 452 and 459 of a matter which should have been presented to the trial court for its consideration in the first instance. [Citations.]" (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325-326; see *People v. Rubics* (2006) 136 Cal.App.4th 452, 462, fn. 5 [declining to take judicial notice "because [the] material was not presented to the trial court at sentencing"].) As the Supreme Court held in *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, "[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court. Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' [Citation]" (*Id.* at p. 444, fn. 3; see *People v. Schoop* (2012) 212 Cal.App.4th 457, 465, fn. 3 [denying request for judicial notice where "there is no indication that the documents were filed or lodged in the trial court"].)

Moreover, the material Leon has submitted is not subject to judicial notice under Evidence Code section 452.**5** Although section 452, subdivision (f), allows a court to take judicial notice of the law of foreign nations and public entities in foreign nations, the document does not purport or appear to be an excerpt of a law of Mexico or any of its states. Nor can we take judicial notice under section 452, subdivision (g) or (h). The

---

**5** Evidence Code section 452 provides: "Judicial notice may be taken of the following matters to the extent that they are not embraced within Section 451: [¶] (a) The decisional, constitutional, and statutory law of any state of the United States and the resolutions and private acts of the Congress of the United States and of the Legislature of this state. [¶] . . . [¶] (c) Official acts of the legislative, executive, and judicial departments of the United States and of any state of the United States. [¶] . . . [¶] (f) The law of an organization of nations and of foreign nations and public entities in foreign nations. [¶] (g) Facts and propositions that are of such common knowledge within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute. [¶] (h) Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

16

document does not reflect matters of common knowledge not reasonably disputed or subject to immediate or accurate verification by indisputably reasonably accurate sources. Because Leon did not present the document to the trial court and it is not a proper subject of judicial notice, we deny Leon's request for judicial notice and his request that we correct his presentence custody credits based on that document.

## DISPOSITION

The judgment is affirmed.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.

WOODS, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.