Filed 12/19/13

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LIONEL FREDRICK JOHNSON, JR.,<br><br>    Defendant and Appellant. | E056878<br><br>(Super.Ct.No. SWF029110)<br><br>**OPINION** |

APPEAL from the Superior Court of Riverside County.  Dennis A. McConaghy, Judge.  (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part; reversed in part and remanded with directions.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

---

\*     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II, IV, V, and VI.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Steve Oetting and Laura A. Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

One SUV rear-ended another SUV that had stopped at a red light. All five occupants of the vehicle that was hit were injured, to varying degrees; one was crippled.

When the police arrived, they found defendant Lionel Fredrick Johnson, Jr. at the scene, blatantly drunk. He admitted that he had been driving and that he hit the other vehicle.

As no eyewitness could identify defendant as the driver, however, defense counsel argued that there was reasonable doubt as to whether defendant was driving. He also argued that defendant's admissions were not credible because "drunk people say crazy things all the time."

After the trial, defendant filed a motion for disclosure of the jurors' identifying information. In support, his parents testified that several jurors had stated that they had concluded only reluctantly that defendant had been driving, partly because he did not take the stand and testify. The trial court denied the motion. In the published portion of this opinion, we will hold that this was error. We will reject the People's arguments that (1) the jurors' statements were inadmissible hearsay, (2) the jurors' statements were inadmissible under Evidence Code section 1150, and (3) defendant had to show that he had made diligent efforts to contact the jurors by other means.

In the nonpublished portion of this opinion, we will hold that the trial court committed one sentencing error.

Accordingly, the matter must be remanded with directions to reconsider defendant's motion. However, if (1) the motion is once again denied, (2) the motion is granted but defendant fails to file a motion for new trial, or (3) defendant files a motion for new trial but the motion for new trial is denied, the trial court must resentence defendant.

I

FACTUAL BACKGROUND

On August 17, 2009, around 2:10 or 2:20 a.m., a 4Runner was stopped at a red light when a Suburban rear-ended it. There was no sound of braking or skidding before the crash. No skid marks were left on the road.

Five people — all members of the same family — were in the vehicle that was hit. Petra Farias, who was in the back seat, had the most severe injuries. Her left leg was jammed under the front passenger seat. Her pelvis was broken. Her leg was broken "in several pieces." Her knee was "shattered." At the time of trial, she could not move her left foot. She could walk only with a walker. She could no longer work. She was "always in intense . . . pain."

Petra's aunt, Delia Montez, who was also in the back seat, suffered a broken vertebra.

3

Petra's mother, Flora Castillo, who was also in the back seat, had experienced pain in her head, neck, rib cage, and pelvis; at the time of trial, she still had occasional chest pain.

Petra's husband, Salvador Farias, was in the front passenger seat. He suffered a "whiplash type injury."

Petra's daughter, Susana Farias, who was driving, escaped with only "big bruises" and neck and back pain. She still had back pain at the time of trial.

Witness Yorilia Beltran happened to drive onto the scene of the crash moments after it occurred. An African-American man was inside the Suburban. She asked him if there was anyone else in the Suburban, and he said no. Later, she saw a police officer approach him.

Highway Patrol officers arrived at the scene around 2:45 a.m. Defendant was there, and Officer Gabriel Lizaola interviewed him. Defendant admitted driving the Suburban. He said he was going 60 or 65 miles an hour when he suddenly "felt a boom to the front of his vehicle." The speed limit was 55 miles an hour.

Officer Lizaola noticed that defendant's breath smelled of alcohol, his speech was slurred, and his eyes were red and watery. He asked defendant if he had "consumed an alcoholic beverage." Defendant replied, "I haven't had shit." Officer Lizaola pointed out that "[he] could smell the odor of an alcoholic beverage emitting from [defendant's] person." Defendant said, "Okay. I had two beers at 6:00."

4

Officer Lizaola administered field sobriety tests to defendant; defendant failed them all. Next, he gave defendant a breath test. However, defendant did not blow as instructed; he blew only weakly, while puffing out his cheeks to make it appear that he was blowing hard. This would have tended to make his reading lower. The resulting blood alcohol readings were 0.164 at 3:22 a.m., 0.163 at 3:24 a.m., and 0.159 at 3:26 a.m.

A blood test, using blood drawn at 5:03 a.m., gave a blood alcohol reading of 0.20.

In the opinion of an expert toxicologist, defendant's actual blood alcohol level at the time of the crash was 0.24.

## II

## PROCEDURAL BACKGROUND

Defendant was found guilty of driving under the influence and causing injury (Veh. Code, § 23153, subd. (a)) and driving with a blood alcohol level of 0.08 percent or more and causing injury (Veh. Code, § 23153, subd. (b)). On each count, one enhancement for personally inflicting great bodily injury (Pen. Code, § 12022.7, subd. (a)) and three enhancements for causing injury to an additional victim (Veh. Code, § 23558) were found true.

Two "strike" priors (Pen. Code, §§ 667, subds. (b)-(i), 1170.12), two prior serious felony conviction enhancements (Pen. Code, § 667, subd. (a)), and one 1-year prior prison term enhancement (Pen. Code, § 667.5, subd. (b)) were found true.

Defendant was sentenced to a total of 41 years to life in prison, along with the usual fines and fees.

5

## III

## DISCLOSURE OF JURORS' IDENTIFYING INFORMATION

Defendant contends that the trial court erred by denying his posttrial motion for disclosure of jurors' identifying information.

A. *Additional Factual and Procedural Background.*

On March 15, 2011, the jury returned its verdicts. At that point, defendant had not waived a jury trial on the priors, so the jurors were ordered to return on March 16. On March 16, however, defendant decided to waive a jury trial, and the trial court excused the jurors.

The court trial on the priors, originally set for May 13, 2011, was repeatedly continued until it was eventually held on November 18, 2011. Sentencing, originally set for January 27, 2012, was likewise repeatedly continued.

On April 26, 2012, defendant filed a motion for release of jurors' personal identifying information. The motion was set for hearing on the date then set for sentencing, May 25, 2012.

On April 26, 2012, defendant filed a motion for release of jurors' identifying information. Defendant's mother and stepfather, Joy and Delvin Livingston, submitted declarations in support of the motion.

They both testified that on March 16, 2011,[1] they had had a conversation with three female jurors. One of the jurors cried and said she was "sorry." She said she wanted to talk to the judge. From there, the mother's and stepfather's accounts of the conversation diverged somewhat.

According to defendant's mother, the conversation took place outside the courtroom. The crying juror said, "[W]hy didn't he take the witness stand and defend himself[?] Why didn't he say something, we need to hear it from him. Did he have any prior DUIs . . . ? Is that the reason why he didn't take the witness stand?" The mother and stepfather then took the crying juror to defense counsel, introduced her, and told him what she had said. Defense counsel gave the crying juror his card and asked her to call him.

According to defendant's stepfather, the conversation took place inside the courtroom. Two jurors said "that i[t] was hard for us to vote guilty" because of the possibility that defendant "was covering for someone else." The crying juror said, "[M]ost of [us] were thinking . . . if [defendant] was not the driver, why didn't he take the stand to defend himself . . . [?]" She added that this was one of the "things the jurors had a hard time with." She continued, "[T]he jury wrestled with . . . why isn't [defendant] taking the stand[?] [Defendant] needed to say something." "The three jurors indicated that they were at least half of the jurors who raised the question if he is innocent why he

---

[1]     The stepfather misdescribed the proceedings on March 16, 2011 as a "sentencing hearing."

7

didn't take the stand to defend himself."  Afterwards, all three jurors talked to defense counsel.

On May 25, 2012, at the hearing on defendant's motion, the prosecutor conceded, "[A]ssuming the facts as stated in the motion are correct, I believe there is good cause to disclose the juror information."  However, he objected to defendant's parents testifying by declaration rather than in person.  He also argued that the passage of time called into question the credibility of the declarations:  "[A] year and three months ago, both parents are here, the jurors are telling them that they disobeyed the Court's rules . . . .  [T]hey disclose this to [defense counsel], who, for a year and three months, did nothing.  [¶]  . . . I believe that if a situation like this would have occurred, [defense counsel] would have acted with a little more haste rather than letting his client wallow in county jail for a year and three months."

Defense counsel responded that the motion was properly brought based on declarations, but in any event, "The [parents] are here. . . .  [T]hey are available."

He also explained:  "I do recall that there were jurors that did . . . speak to me.  I was . . . speaking with the parents.  Some jurors did stay.  How the issue came up, is that the parents w[ere] speaking to someone else . . . who['s] a lawyer, and then that particular attorney told the parents that they need to disclose that information to me, so they did so.  Then I did . . . file the motion."

The trial court ruled:  "I've read the declarations, and I disagree with both of you.  If [*sic*] the declaration of [defendant's stepfather], first, one of the jurors says she was

8

sorry. That doesn't mean anything. I've sat on a jury. I've made Court decisions. Lots of times you're sorry that you have to do what you have to do. And then she said that it was hard for us to vote guilty. I think it's hard to vote guilty for anybody. And being hard to vote guilty is not reason to disclose.

"And going through ─ just going through the declaration [it] said [defendant] . . . may not have been the driver. It was possible that he was covering for someone else. That is just talking about the procedure that they went through, getting to the fact — getting to the point where they voted guilty.

"I just don't see any reason to grant this motion. I'm going to deny it."

Meanwhile, the trial court also further continued the sentencing hearing to July 13, 2012.

B.  *Analysis.*

1.  *Legal background.*

Under Code of Civil Procedure section 237, in a criminal case, the trial jurors' "personal juror identifying information" — defined as their names, addresses, and telephone numbers — must be sealed after their verdict is recorded. (Code Civ. Proc., § 237, subd. (a).) However, "[a]ny person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information." (Code Civ. Proc., § 237, subd. (b); see also Code Civ. Proc., § 206, subd. (g).)

9

If the trial court finds that the moving party has made a prima facie showing of good cause, and if it finds no compelling interest against disclosure, it must set the matter for hearing.  (Code Civ. Proc., § 237, subd. (b).)  The trial jurors are entitled to notice, an opportunity to object to disclosure, and an opportunity to appear.  (Code Civ. Proc., § 237, subd. (c).)

If none of the jurors object, the trial court must grant disclosure.  However, if a juror is unwilling to be contacted, the trial court must deny disclosure.  (Code Civ. Proc., § 237, subd. (d).)[2]

We review an order on a motion for disclosure of jurors' identifying information under the deferential abuse of discretion standard.  (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991.)

2.      *Hearsay in the declarations*.

The prosecution's objection below to proceeding on declarations was unfounded.  Under Code of Civil Procedure section 237, subdivision (b), the motion is supposed to be based on declarations.[3]

---

[2]      Code of Civil Procedure section 237, subdivision (d) further provides that if (1) a juror objects, but (2) the juror is not unwilling to be contacted, the trial court must order disclosure, unless it finds either no good cause or a compelling interest against disclosure.  In practice, it is hard to imagine why a juror who is willing to be contacted would object.

The statute is also somewhat unclear about whether one objecting juror can block the disclosure of other jurors' information.

[3]      The parents' declarations were not executed under penalty of perjury; they did not use the wording prescribed by Code of Civil Procedure section 2015.5.  The

*[footnote continued on next page]*

In this appeal, the People argue that the parents' declarations consisted of hearsay, in that they had no personal knowledge of what took place in the jury room. They forfeited this objection by failing to raise it below. (Evid. Code, § 353, subd. (a).) Separately and alternatively, it lacks merit. The whole point of moving for the disclosure of jurors' identifying information is to talk to the jurors; and the whole point of talking to the jurors is to obtain evidence of juror misconduct that will support a motion for new trial. The only people who can testify of their own personal knowledge about what happened in the jury room are the jurors themselves. Thus, it would be absurd to require a defendant seeking disclosure to introduce, at that preliminary stage, admissible evidence that juror misconduct actually occurred. Rather, the defendant simply has to prove that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct.

In this respect, a motion for the disclosure of jurors' identifying information is analogous to a *Pitchess* motion for disclosure of a police officer's confidential personnel records. A *Pitchess* motion can be based on a declaration made on information and belief — i.e., hearsay. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 86-89.) As the Supreme Court has explained: """Whenever the statute, either in express terms or by

_____

*[footnote continued from previous page]*
prosecution, however, did not object on that ground. Thus, it forfeited any such objection. Moreover, even if it had objected, defense counsel's offer to have the parents testify under oath at the hearing could have cured the problem. In any event, this was not why the trial court denied the motion.

11

implication, requires a person to make a statement which from the very nature of things can only be made on information and belief, an affidavit in that form meets the demands of the statute.'"'" (*Id*. at p. 87.) "Because defense counsel would only rarely be present when the alleged officer misconduct occurred, counsel has little information to offer based on counsel's personal knowledge." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1026.)

A juror's out-of-court statement that misconduct occurred, when offered in support of a motion for disclosure, is not offered for the truth of the matter asserted; thus it is not hearsay. It is simply used to show good cause to contact the juror. Once the juror is contacted, if the juror confirms the misconduct, the juror's testimony can be used to support a motion for new trial. On the other hand, if the juror denies the misconduct, the out-of-court statement becomes admissible as a prior inconsistent statement. (Evid. Code, § 1235.) Accordingly, in this case, the trial court properly considered the jurors' out-of-court statements to the parents.

      3.     *Evidence Code section 1150.*

The People also argue that the jurors' statements were inadmissible under Evidence Code section 1150. Once again, they did not object on this ground below. However, evidence that violates Evidence Code section 1150 is not merely inadmissible; it is irrelevant — "of no jural consequence." (*People v. Steele* (2002) 27 Cal.4th 1230, 1264.) Thus, the People did not have to object below to preserve this contention.

Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

"'This statute distinguishes "between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . ." [Citation.] "This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration." [Citations.]' [Citation.]" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1281.)

"Evidence Code section 1150, while rendering evidence of the jurors' mental processes inadmissible, expressly permits, in the context of an inquiry into the validity of a verdict, the introduction of evidence of 'statements made . . . within . . . the jury room.' We have warned, however, that such evidence 'must be admitted with caution,' because '[s]tatements have a greater tendency than nonverbal acts to implicate the reasoning processes of jurors.' [Citation.] But statements made by jurors during deliberations are

13

admissible under Evidence Code section 1150 when 'the very making of the statement sought to be admitted would itself constitute misconduct.' [Citation.]" (*People v. Cleveland* (2001) 25 Cal.4th 466, 484.)

Here, defendant's mother's declaration was entirely irrelevant under Evidence Code section 1150. According to her, only the crying juror spoke, and the only thing she spoke about was her own mental processes. Indeed, she appeared to be speaking about her own mental processes at that moment, not necessarily when she returned her verdict. Thus, all her statement showed was that she had second thoughts.

Portions of defendant's stepfather's declaration were likewise irrelevant under Evidence Code section 1150. For example, the statement that it "was hard for us to vote guilty" because of the possibility that defendant "was covering for someone else" was inadmissible evidence of the jurors' mental processes. Statements about what the jurors were "thinking," what they "wrestled with," and what they "had a hard time with" were likewise inadmissible.

One statement in the stepfather's declaration, however, was relevant and admissible — the statement that "at least half of the jurors . . . raised the question if he is innocent why he didn't take the stand to defend himself." The jury had been instructed: "A defendant has an absolute constitutional right not to testify. . . . Do not consider, for any reason at all, the fact that the defendant did not testify." (CALCRIM No. 355.) "[B]y violating the trial court's instruction not to discuss defendant's failure to testify, the jury committed misconduct. [Citations.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1425.)

14

Moreover, the mere making of such a statement in the jury room was an overt act of misconduct and admissible as such under Evidence Code section 1150. (*People v. Hord* (1993) 15 Cal.App.4th 711, 725; *People v. Perez* (1992) 4 Cal.App.4th 893, 908.)

4. *The trial court's exercise of discretion.*

The trial court does not seem to have realized that the declarations showed that the jurors had improperly considered defendant's failure to testify. According to the trial court's summary of the evidence, a juror said she was "sorry," a juror said it "was hard for us to vote guilty," and a juror said defendant may have been "covering for someone else." In addition, however, as already discussed, there was admissible evidence that the jurors considered defendant's failure to testify, which constituted misconduct. By disregarding that evidence, the trial court abused its discretion.

The People argue that we should nevertheless sustain the denial of defendant's motion, because defendant failed to show that he had made diligent efforts to contact the jurors by other means. To understand the law on this issue, it is necessary to examine the history of Code of Civil Procedure section 237.

In 1989, in *People v. Rhodes* (1989) 212 Cal.App.3d 541, the appellate court outlined a nonstatutory procedure for obtaining jurors' identifying information after a criminal trial. After balancing the countervailing interests in confidentiality and in disclosure (*id.* at pp. 548-551), it held that "upon timely motion, counsel for a convicted defendant is entitled to the list of jurors who served in the case, including addresses and telephone numbers, if the defendant sets forth a sufficient showing to support a

15

reasonable belief that jury misconduct occurred, *that diligent efforts were made to contact the jurors through other means*, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial." (*Id*. at pp. 551-552, emphasis added.)

In 1992, the Legislature enacted Code of Civil Procedure section 237. At the time, this section allowed the trial court to seal jurors' identifying information on request. (Code Civ. Proc., former § 237, subd. (b), Stats. 1992, ch. 971, § 3.) The Legislature also amended Code of Civil Procedure section 206 so as to allow a convicted defendant to request the release of jurors' identifying information, if "necessary for the defendant to communicate with jurors for the purpose of developing issues on appeal or any other lawful purpose." (Code Civ. Proc., former § 206, subd. (f), Stats. 1992, ch. 971, § 2.)

In 1995, the Legislature amended Code of Civil Procedure section 237 so as to *require* the trial court to seal jurors' identifying information. (Code Civ. Proc., § 237, subd. (a)(2), Stats. 1995, ch. 964, § 3.) However, it also allowed any person to move for release of the information, based on a declaration showing good cause. (Code Civ. Proc., § 237, subd. (b), Stats. 1995, ch. 964, § 3.)

For a time, courts had been split with respect to whether the 1992 statutory procedure superseded *Rhodes*'s nonstatutory requirement of a showing of good cause. (Compare *People v. Granish* (1996) 41 Cal.App.4th 1117, 1127-1129 [Fourth Dist., Div. Two] [showing of good cause required] with *People v. Simms* (1994) 24 Cal.App.4th 462, 467-468 [showing of good cause not required].) The 1995 amendments, however, were

16

understood as imposing a good cause requirement by statute.  (See *People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1321, fn. 8; see also *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1096, fn. 4.)

In support of their claim that defendant had to show diligent efforts to contact the jurors through other means, the People cite *People v. Jones* (1998) 17 Cal.4th 279.  *Jones*, however, did not involve a motion under Code of Civil Procedure section 237.  Rather, in *Jones*, as the Supreme Court specifically noted, "the verdict was returned before Code of Civil Procedure 237 was enacted . . . ."  (*Id.* at p. 317.)  Accordingly, the court held that the nonstatutory procedure outlined in *Rhodes* applied.  (*Jones*, *supra*, at p. 317.)  And, of course, under *Rhodes*, the defendant had to show "that diligent efforts were made to contact the jurors through other means . . . ."  (*Jones*, *supra*, at p. 317, citing *People v. Rhodes*, *supra*, 212 Cal.App.3d at pp. 551-552.)

Code of Civil Procedure section 237 does not expressly require a defendant to show diligent efforts to contact the jurors through other means.  Moreover, we do not believe that such a requirement can be implied as a matter of "good cause."  It must be remembered that, when *Rhodes* was decided, jurors' identifying information was not sealed.  Indeed, as *Rhodes* noted, "the master list of qualified jurors, including names and addresses, [wa]s a judicial record subject to public disclosure.  [Citations.]"  (*People v. Rhodes*, *supra*, 212 Cal.App.3d at p. 550.)  Since the 1995 amendments to Code of Civil Procedure section 237, however, jurors' identifying information is sealed, and a motion for disclosure is necessary to obtain it.

17

If we were to hold that such a motion requires a showing that the defense has tried to contact the jurors by other means, we would be forcing counsel to try to find ways around the seal. Admittedly, some jurors do willingly contact defense counsel after the trial. However, defense counsel would have to try to track down the unwilling jurors. Would they have to pester the willing for details about the unwilling? Would they have to hire private detectives? Because the Legislature provided that jurors' identifying information must be sealed, we conclude it did not intend to require a defendant to show diligent efforts to obtain the sealed information as a condition of unsealing it.

At oral argument, the People argued for the first time that the trial court should have denied the motion as untimely. It is important to note that this is significantly different from the argument, which they *did* raise in their brief, that defendant failed to show diligent efforts to contact the jurors by other means. Their reframed argument is that, *even if* a defendant does not have to try to contact the jurors by other means, he or she *still* must bring a motion for disclosure promptly after learning that grounds for such a motion exist.

*Rhodes* required that a motion for juror's identifying information be "timely." (*People v. Rhodes*, *supra*, 212 Cal.App.3d at p. 551.) By contrast, Code of Civil Procedure sections 206 and 237 do not contain an express timeliness requirement. However, they have been construed as having an implied timeliness requirement, albeit only a limited one.

The controlling authority on this point is *People v. Duran* (1996) 50 Cal.App.4th 103. There, the defendant filed a new trial motion based on juror misconduct; it was supported by an investigator's declaration about his interview of one of the jurors. (*Id*. at pp. 108-109.) The prosecution objected to the declaration as hearsay. (*Id*. at p. 109.) On the date set for the hearing on the new trial motion, which was also the date set for sentencing, defense counsel orally requested the names and addresses of the other jurors. The trial court denied the request as untimely. (*Id*. at p. 110.)

On appeal, the court noted that Code of Civil Procedure section 206 does require that the juror information be sought for a "lawful purpose." (*People v. Duran*, *supra*, 50 Cal.App.4th at p. 122.) In the case before it, the defendant's purpose was to support a motion for new trial. However, he would not have been able to use the information for that purpose unless he could obtain a continuance of the hearing on his motion for new trial as well as the sentencing hearing. Moreover, to obtain a continuance, he would have to show that he and his counsel had shown due diligence. The court held that the defendant could not show due diligence, because his counsel could have sought the jurors' personal identifying information when he first learned of the possible misconduct; instead, he did not raise the issue for six weeks. (*Id*. at p. 122.) The court concluded: "Since appellant failed to show he exercised due diligence in pursuing this claim, there was no basis shown for continuing the hearing on the motion for new trial. Since appellant sought this information to support his motion for new trial, there was no longer

a lawful purpose to be served by releasing this information. The trial court thus acted properly in denying the untimely request for juror information." (*Id*. at p. 123.)

Here, the sentencing hearing was set for May 25, 2012. Defendant filed his motion for disclosure on April 26 and set it for hearing on May 25. Meanwhile, however, he also filed a motion for a continuance of the sentencing hearing, on the ground that a "key witness" was unavailable. As already discussed, the trial court denied the motion for disclosure, but it granted the motion for a continuance; it continued the sentencing hearing to July 13. This would have given defendant time to contact the jurors and to file a motion for new trial, set for hearing on July 13. Thus, defendant did not have to show any additional good cause for a continuance. In particular, under *Duran*, he did not have to show due diligence in bringing the motion for disclosure. Even assuming he did not act with due diligence, he was still seeking the information for a "lawful purpose."

Finally, we also consider whether the trial court should have denied defendant's motion because, as the prosecutor argued below, the declarations were not credible. Certainly there was room for skepticism. The mother and stepfather contradicted each other on several points. If one chooses to credit the mother's account over the stepfather's, then there is no admissible evidence of juror misconduct at all. Moreover, it is hard to believe that the jurors told defendant's parents that they wanted to talk to the judge but did not say this to defense counsel. Indeed, according to the mother, she told defense counsel what the juror had said. Even assuming this information was not

20

volunteered, it is hard to believe that defense counsel did not take the opportunity to debrief the jurors.

Nevertheless, "'[t]he power to judge the credibility of witnesses and to resolve conflicts in the testimony is vested in the trial court" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1463), even when the witnesses testify via declarations. (*Id*. at pp. 1463-1464.) Here, the trial court denied the motion, but not because the declarations were incredible. We cannot say that the declarations were incredible as a matter of law. Thus, we cannot affirm the denial on this ground. However, it will be open to the trial court to make such a determination on remand.

5. *Conclusion*.

In sum, we conclude that the trial court erred. Assuming that defendant's stepfather's declaration was credible, defendant was entitled to disclosure of the jurors' identifying information. However, because of our doubts regarding the credibility of both declarations, we cannot say that the motion should have been granted. Rather, the appropriate appellate remedy is to remand with directions to reconsider the motion.

On remand, if the trial court grants the motion, it shall allow defense counsel a reasonable time to try to contact the jurors, to determine whether a motion for new trial is warranted, and if so, to file a motion for new trial. However, unless a motion for new trial is not only timely filed but actually granted, the trial court shall resentence defendant.

21

## IV

## DUAL USE OF THE INFLICTION OF GREAT BODILY INJURY

Defendant contends that the trial court could not impose both a great bodily injury enhancement and a prior serious felony enhancement.

Penal Code section 1170.1, subdivision (g), as relevant here, provides: "When two or more enhancements may be imposed for the infliction of great bodily injury on the same victim in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense."

It is self-evident that a great bodily injury enhancement under Penal Code section 12022.7 is an "enhancement[] . . . for the infliction of great bodily injury" within the meaning of Penal Code section 1170.1, subdivision (g).

Defendant argues, however, that a prior serious felony conviction enhancement under Penal Code section 667, subdivision (a) is *also* an "enhancement[] . . . for the infliction of great bodily injury." He reasons that a prior serious felony conviction enhancement requires (among other things) that the *current* conviction be a "serious felony." (Pen. Code, § 667, subd. (a).) Defendant's current convictions — for driving under the influence with injury (Veh. Code, § 23153, subds. (a), (b)) — are not serious felonies, standing alone. They are serious felonies in this case, but only because "defendant personally inflict[ed] great bodily injury on a[] person, other than an accomplice . . . ." (Pen. Code, § 1192.7, subd. (c)(8).)

22

Defendant relies on two cases, *People v. Rodriguez* (2009) 47 Cal.4th 501 and *People v. Gonzalez* (2009) 178 Cal.App.4th 1325.

*Rodriguez* involved Penal Code section 1170.1, subdivision (f), which provides: "When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense." (*People v. Rodriguez*, *supra*, 47 Cal.4th at p. 508.)

In *Rodriguez*, the defendant was convicted of assault with a firearm (Pen. Code, § 245, subd. (a)(2)), with a personal firearm use enhancement (Pen. Code, § 12022.5, subd. (a)) and a gang enhancement; the gang enhancement was elevated to 10 years, because the current conviction was for a violent felony (Pen. Code, § 186.22, subd. (b)(1)(C)). (*People v. Rodriguez*, *supra*, 47 Cal.4th at p. 505.)

The Supreme Court held that the trial court erred by imposing both the personal firearm use enhancement and the gang/violent felony enhancement. (*People v. Rodriguez*, *supra*, 47 Cal.4th at p. 509.) It explained: "The standard additional punishment for committing a felony to benefit a criminal street gang is two, three, or four years' imprisonment. [Citation.] But when the crime is a 'violent felony . . . ,' section 186.22's subdivision (b)(1)(C) calls for additional punishment of 10 years. Here, defendant became eligible for this 10–year punishment only because he 'use[d] a firearm which use [was] charged and proved as provided in . . . Section 12022.5.' [Citation.] Thus, defendant's firearm use resulted in additional punishment not only under section

23

12022.5's subdivision (a) (providing for additional punishment for personal use of a firearm) but also under section 186.22's subdivision (b)(1)(C), for committing a violent felony as defined in section 667.5, subdivision (c)(8) (by personal use of firearm) to benefit a criminal street gang. Because the firearm use was punished under two different sentence enhancement provisions, each pertaining to firearm use, section 1170.1's subdivision (f) requires imposition of 'only the greatest of those enhancements' with respect to each offense." (*Rodriguez*, *supra*, at p. 509.)

*Gonzalez* was similar, except that — like this case — it involved Penal Code section 1170.1, subdivision (g). (*People v. Gonzalez*, *supra*, 178 Cal.App.4th at p. 1327.)

In *Gonzalez*, the defendant was convicted of aggravated assault (Pen. Code, § 245, subd. (a)(1)), with a great bodily injury enhancement (Pen. Code, § 12022.7, subd. (a)) and a 10-year gang/violent felony enhancement). (*People v. Gonzalez*, *supra*, 178 Cal.App.4th at p. 1327.)

The appellate court held that the trial court erred by imposing both the great bodily injury enhancement and the gang/violent felony enhancement. It stated: "We find the Supreme Court's reasoning in *Rodriguez* persuasive and squarely applicable to the present case. . . . Here, appellant's infliction of great bodily injury on a single victim subjected him to a three-year enhancement under section 12022.7, subdivision (a). The same infliction of great bodily injury on the same victim also turned appellant's underlying assault offense into a 'violent felony' under section 667.5, which subjected him to a 10–year enhancement under section 186.22, subdivision (b)(1)(C). In other words, the trial

24

court imposed two enhancements for appellant's infliction of great bodily injury on the same victim in the commission of a single offense." (*People v. Gonzalez*, *supra*, 178 Cal.App.4th at pp. 1331-1332.)

The People argue that *Rodriguez* and *Gonzalez* are distinguishable because they involved a gang/violent felony enhancement, which is a conduct enhancement, whereas this case involves a prior serious felony enhancement, which is a status enhancement. This is a distinction without a difference. Nothing in the reasoning of either *Rodriguez* or *Gonzalez* turned on whether they involved conduct enhancements or status enhancements. Rather, it turned on whether both enhancements were triggered by personal firearm use (in *Rodriguez*) or infliction of great bodily injury (in *Gonzalez*). Here, defendant would not have been subject to a prior serious felony enhancement if he had not inflicted great bodily injury in the current offense. Indeed, under these circumstances, one could view the prior serious felony enhancement as a hybrid status/conduct enhancement — it applies due to the confluence of both a certain status (a prior serious felony conviction) and certain conduct (infliction of great bodily injury).[4]

---

[4] Based on *Rodriguez* and *Gonzalez*, it could be argued that a trial court could not impose two gang/violent felony enhancements in the same case (at least, not when they are both based on a single instance of personal firearm use or on the infliction of great bodily injury on a single victim).

In this case, defendant does not argue that the trial court could not impose two prior serious felony enhancements. We deem him to have forfeited any such contention.

The People also note that "there is a prohibition against striking or staying enhancements under [Penal Code] section 667[, subd.] (a)(1)."  That prohibition is statutory; it is found in Penal Code section 1385, subdivision (b), which states:  "*This section* does not authorize a judge to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667."  (Italics added.)  Here, the issue is not whether the trial court could strike the enhancements in the interests of justice under Penal Code section 1385; rather, it is whether it was prohibited from imposing them under Penal Code section 1170, subdivision (g).

The appropriate appellate remedy is not to strike the lesser punishment, but rather to remand for resentencing.  (*People v. Rodriguez*, *supra*, 47 Cal.4th at p. 505.)

V

*ROMERO* MOTION

Defendant contends that the trial court erred by denying his *Romero* motion.

A.      *Additional Factual Background*.

At the time of sentencing, defendant was 35 years old.  Between the ages of 11 and 18, he had been a member of the North Side Gangsta Crips.  He started abusing alcohol and various drugs in his teen years.  However, he claimed to have been sober since being sent to prison in 2002, "except for two relapses."

Defendant admitted drinking on the day of the accident and being drunk when it occurred.  He claimed, however, that "a friend he did not wish to name" was driving.  He

26

said that this friend "left the scene on foot, and the defendant regrets that he did not leave the scene, too."

Defendant admitted having been on juvenile probation, though the probation officer was unable to find any record of this.

He had the following adult convictions (the two strike priors are indicated by bolding):

**September 1996**: Second degree robbery. (Pen. Code, § 211.) Defendant committed the robbery with fellow gang members, when he was 19. Two other youths robbed a minimart at gunpoint; defendant was the getaway driver. Defendant was placed on probation for five years. After the conviction, defendant moved from San Joaquin County to Riverside County. His attorney claimed that he did so to escape the negative influences around him. However, defendant told the probation officer that he was "'kicked out of the county' and his 'homies' believed that he provided information to the police."

December 1997: Driving with a blood alcohol level of 0.08 percent or more. (Veh. Code, § 25152, subd. (b).) Defendant was placed on probation for three years. He failed to complete a first offender DUI program.

May 2000: Second degree burglary (Pen. Code, § 459), petty theft with a prior (Pen. Code, § 666), receiving stolen property (Pen. Code, § 496), and possession of burglary tools (Pen. Code, § 466). According to defendant, he was using crack at the time, and he stole coins from some washing machines. The commission of these offenses

27

constituted a violation of defendant's probation. Defendant was placed on probation for three years, on conditions including a 180-day jail term.

June 2002: Driving with a blood alcohol level of 0.08 percent or more, driving with an open alcohol container (Veh. Code, § 23222, subd. (a)), and driving with a license revoked or suspended for drunk driving (Veh. Code, § 14601.2, subd. (a)). The commission of these offenses constituted a violation of defendant's probation. Defendant was placed on probation for four years, on conditions including a 30-day jail term.

August 2002: Possession of a controlled substance. (Health & Saf. Code, § 11359, subd. (a).) For some reason, this was not treated as a probation violation. Defendant was placed on probation for three years.

November 2002: Two counts of second degree burglary and battery (Pen. Code, § 242). According to defendant, he shoplifted from a Wal-Mart so he could pay a debt he owed to drug dealers. When he left the store, he got into a "struggle" with a Wal-Mart loss prevention employee; the employee sustained minor cuts. The commission of these offenses constituted a violation of defendant's probation. Defendant was sentenced to two years eight months in prison.

**April 2003**: Second degree robbery. According to defendant, he shoplifted from a Kmart; in the parking lot, a loss prevention employee confronted him, and defendant threatened the employee with a screwdriver. Defendant was sentenced to three years in prison. In September 2005, he was released on parole, but he was arrested in December

28

2007 on a parole violation and returned to prison. In June 2008, he was released on parole again; this time, he evidently completed parole successfully.

Defendant claimed that, since his release from prison in 2005, he had become "a productive and beneficial member of society." However, he had been unemployed for nearly two years when the accident occurred. He also claimed that, up until his arrest, he was in a medical assistant vocational training program, in which he had a 3.5 GPA. His transcript, however, showed that he had withdrawn from the program before the accident.

B. *Additional Procedural Background*.

Defendant filed a written *Romero* motion. He argued that the strike priors were remote and the underlying facts were not egregious; the current offense did not involve intentional violence; he was "beyond remorseful"; and he had good prospects for the future. The motion included letters of support from his friends and family members. His mother and stepfather spoke in his support at the hearing.

The trial court denied the motion. It explained, "[H]e doesn't accept responsibility for anything that he's done." It also noted that defendant had not "led a clean life" since the last strike; he had violated his parole. It concluded: "The Three Strikes law was written for cases like this where somebody gets a strike, they get another strike, and they don't stay clean."

C. *Analysis*.

In *Romero*, the Supreme Court held that a trial court has discretion to dismiss a three-strikes prior felony conviction allegation under Penal Code section 1385. (*People v.*

*Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530.) The focus of the analysis must be on "'"whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' [Citation.]" (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

"Because the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*People v. Carmony*, *supra*, 33 Cal.4th at p. 378.)

"[A] trial court's refusal or failure to dismiss or strike a prior conviction allegation under section 1385 is subject to review for abuse of discretion." (*People v. Carmony*, *supra*, 33 Cal.4th at p. 375.)

We are at a loss to perceive any extraordinary circumstances in this case. Defendant is precisely the kind of revolving-door recidivist that the three strikes law was designed for. Substance abuse was clearly a major factor in causing him to commit both violent theft crimes (i.e., strikes) and drunk driving crimes, including the current offense.

Defendant argues that his current offense did not involve intentional violence. However, the electorate has deliberately extended the reach of the three strikes law to include crimes of negligent as well as intentional violence.

Defendant also argues that his conduct in connection with the strikes was "not as serious as many robbery offenses . . . ." Actually, his first strike — the gang-related armed robbery of a minimart — was quite serious; while defendant was only the getaway driver, his conviction means that he intended to facilitate and did facilitate the robbery. His second strike, while less serious, did not stand alone. Defendant was inferably stealing repeatedly to support his drug habit. He had previously committed an almost identical crime that could have been charged as a robbery, but was charged as a burglary-plus-battery instead. This recidivist behavior places defendant squarely within the spirit of the three strikes law.

Defendant claims that, after his first strike, he moved out of the area "to get away from bad influences." There is no evidence of this. Defendant told the probation officer that he was forced to move ("kicked out of the county"), possibly because he was viewed as a snitch. In any event, those "bad influences" were evidently not to blame for defendant's criminal conduct, as he continued it on his own.

Defendant argues that he had no convictions since his parole in September 2005. He did have an unspecified parole violation, however, which caused him to be rearrested in December 2007. He was released from prison again in June 2008, and he committed the current offenses in August 2009. This is hardly a significant crime-free period.

Next defendant argues that he had "good prospects." Not so. He had been unemployed for nearly two years (although, admittedly, that period included seven months in prison). He places great stress, as he did below, on the fact that he had good grades in a medical assistant training program. However, as the trial court perspicaciously noted, he had already dropped out of the program before the accident occurred. While defendant enjoyed the support of his family, it evidently had not helped him to avoid a life of crime.

We therefore conclude that the trial court did not abuse its discretion by denying defendant's *Romero* motion. Indeed, we believe that it would have been an abuse of discretion to *grant* the motion.

VI

CRUEL AND UNUSUAL PUNISHMENT

Defendant contends that his sentence of 41 years to life[5] constitutes cruel and unusual punishment.

Defendant forfeited this contention by failing to raise it below. (*People v. Kelley* (1997) 52 Cal.App.4th 568, 583; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27; *People v. Ross* (1994) 28 Cal.App.4th 1151, 1157, fn. 8.) He does not assert ineffective

---

[5] Even though three Vehicle Code section 23558 enhancements were found true on each count, at sentencing, defense counsel told the trial court that there were only two. The prosecutor concurred. Thus, the trial court imposed only two.

We point this out so the trial court can correct the error in any resentencing.

assistance of counsel, so we have no occasion to address the issue under that rubric.

Separately and alternatively, however, we also reject this contention on the merits.

A.      *Analysis Under the Federal Constitution.*

In *Ewing v. California* (2003) 538 U.S. 11 [123 S.Ct. 1179, 155 L.Ed.2d 108], the plurality opinion, signed by three justices, upheld a three-strikes sentence of 25 years to life for grand theft. It explained: "When the California Legislature enacted the three strikes law, it made a judgment that protecting the public safety requires incapacitating criminals who have already been convicted of at least one serious or violent crime. Nothing in the Eighth Amendment prohibits California from making that choice." (*Id.* at p. 25 [plur. opn. of O'Connor, J.].) With respect to the particular defendant, it noted: "In weighing the gravity of Ewing's offense, we must place on the scales not only his current felony, but also his long history of felony recidivism." (*Id.* at p. 29.) It concluded: "Ewing's sentence is justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and amply supported by his own long, serious criminal record." (*Id.* at pp. 29-30, fn. omitted.)

Justices Scalia and Thomas, concurring in the judgment, believed that the cruel and unusual punishment clause simply does not guarantee proportionality. (*Ewing v. California*, *supra*, 538 U.S. at pp. 31 [conc. opn. of Scalia, J.], 32 [conc. opn. of Thomas, J.].) Thus, a clear majority of the United States Supreme Court would uphold a three-strikes sentence in all but an "'exceedingly rare'" case. (*Id.* at p. 21; see also *Lockyer v. Andrade* (2003) 538 U.S. 63, 73-76 [123 S.Ct. 1166, 155 L.Ed.2d 144].)

This is not even close to being such a case.

Defendant argues again (see part V.C, *ante*) that his current offense did not involve intentional violence. Nevertheless, unlike the grand theft in *Ewing*, it was a new serious and violent felony. Thus, defendant deserves a potential life sentence even more than Mr. Ewing did.

Recently, in *In re Coley* (2012) 55 Cal.4th 524, the California Supreme Court held that a third-strike sentence of 25 years to life in prison for the nonserious, nonviolent offense of failing to update one's sex offender registration did not violate the federal cruel and unusual punishment clause. (*Id*. at p. 562.) It noted that "petitioner deliberately failed to register as a sex offender even though he knew he had an obligation to do so . . . ." (*Id*. at p. 561.) This "demonstrated that, notwithstanding the significant punishment that he had incurred as a result of his prior serious and violent felony convictions, petitioner was still intentionally unwilling to comply with important legal requirements prescribed by the state's criminal laws." (*Id*. at pp. 561-562.)

Here, again, defendant's triggering offense is, in itself, a serious and violent felony. Moreover, defendant deliberately drove while drunk, even though he knew that he had an obligation not to do so. Thus, much as in *Coley*, his current offense demonstrated that, despite incurring significant punishment for his prior serious and violent felonies, defendant was still intentionally unwilling to comply with important legal requirements prescribed by the state's criminal laws.

In a related argument, defendant asserts that, if only he had engaged in all of the same intentional acts but had not caused any great bodily injury, he would not have been subject to a three strikes sentence. Yes, and if our grandmother had wheels, she'd be a streetcar. The fact is that defendant *did* cause great bodily injury; the Legislature can constitutionally impose greater punishment based on this factor. Defendant's position — reduced to its essence — is that it is cruel and unusual punishment to impose an increased sentence based on *any* aspect of the crime that was not intended by the perpetrator. That is not the law. (See, e.g., *People v. Thongvilay* (1998) 62 Cal.App.4th 71, 88-89 [sentence of 25 years to life for unintentional felony murder is not cruel and unusual punishment] [Fourth Dist., Div. Two].)

Defendant also argues that his prior robberies were relatively nonserious, as robberies go. As already noted (see part V.C, *ante*), we disagree. In any event, because robberies of any kind are serious and violent felonies, it does not violate the federal constitution — in the absence of some exceedingly rare mitigating circumstances, and there are none here — to subject defendant to punishment as a recidivist.

B.      *Analysis Under the State Constitution.*

Under the state constitutional standard, "'[t]o determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal

35

characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.]' [Citation.] . . . 'If the court concludes that the penalty imposed is "grossly disproportionate to the defendant's individual culpability" [citation], or, stated another way, that the punishment ""shocks the conscience and offends fundamental notions of human dignity"" [citation], the court must invalidate the sentence as unconstitutional.' [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 686.)

*In re Lynch* (1972) 8 Cal.3d 410 indicated that a court may also "compare the challenged penalty with the punishments prescribed in the *same jurisdiction* for *different offenses* which, by the same test, must be deemed more serious" (*id*. at p. 426), and "compar[e] . . . the challenged penalty with the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision" (*id*. at p. 427). Subsequently, however, our high court held that, as long as punishment is proportionate to the defendant's individual culpability ("intracase proportionality"), there is no requirement that it be proportionate to the punishments imposed in other similar cases ("intercase proportionality"). (E.g., *People v. McDowell* (2012) 54 Cal.4th 395, 444.) Accordingly, the determination of whether punishment is cruel and unusual may be based solely on the offense and the offender. (*People v. Ayon* (1996) 46 Cal.App.4th 385, 399, disapproved on other grounds in *People v. Deloza* (1998) 18 Cal.4th 585, 600, fn. 10, and cases cited.)

Here, the outstanding characteristic of both the offense and the offender is the recidivist commission of serious and violent felonies. Defendant has manifested a

persistent inability to conform his conduct to the requirements of the law.  Based on such recidivism, a term of 25 years to life for each current offense "is not constitutionally proscribed."  (*People v. Stone* (1999) 75 Cal.App.4th 707, 715.)

VII

DISPOSITION

The judgment with respect to the conviction is affirmed, and the judgment with respect to the sentence is reversed, subject to the following conditions.  On remand, the trial court must reconsider defendant's motion for disclosure of jurors' identifying information, and it must grant that motion, unless it finds that the evidence that otherwise supports the motion is not credible.  If the trial court grants the motion, it must allow defendant a reasonable time to file a motion for new trial.  If (1) the trial court denies the motion for disclosure of jurors' identifying information, (2) the trial court grants the motion for disclosure of jurors' identifying information, but defendant fails to file a timely motion for new trial, or (3) defendant files a timely motion for new trial, but the trial court denies the motion for new trial, the trial court must resentence defendant.  If, however, a motion for new trial is filed and granted, the matter shall proceed accordingly.

CERTIFIED FOR PARTIAL PUBLICATION

RICHLI _____
                                    J.

We concur:

RAMIREZ _____
                  P. J.
McKINSTER _____
                  J.